STATE of Minnesota, by its Attorney General, Hubert H. HUMPHREY, III, Respondent,

v.

CASINO MARKETING GROUP, INC., Defendant,

Larry J. Hall, a/k/a "Bud Hall" d/b/a "721 Associates" and d/b/a "Associated Marketing," petitioner, Appellant.

STATE of Minnesota, by its Attorney General, Hubert H. HUMPHREY, III, Respondent,

v.

UNIVERSAL AMERICAN CREDIT CARD, INC., Respondent,

Larry J. Hall, a/k/a "Bud Hall" d/b/a "721 Associates" and d/b/a "Associated Marketing," petitioner, Appellant.

No. C1–91–598.

Supreme Court of Minnesota.

Nov. 6, 1992.

Randall D.B. Tigue, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., James P. Jacobson, Sp. Asst. Atty. Gen., St. Paul, for State.

Robert M. Lindstrom, Minneapolis, for Universal American Credit Card, Inc.

John Riemer, MCLU Volunteer Atty., St. Paul (Deborah Gilman, Legal Counsel, Minnesota Civil Liberties Union, Minneapolis, of counsel), for amicus curiae.

COYNE, Justice.

We examine whether the trial court's issuance of a temporary injunction enjoining Hall from using automatic dialing-announcing devices (ADADs) in contravention of Minn.Stat. §§ 325E.26–.31 [1] during the

## 1. AUTOMATIC DIALING–ANNOUNCING DEVICES

**325E.26 DEFINITIONS.**

Subdivision 1. **Scope.** The terms used in sections 325E.26 to 325E.30 have the meanings given them in this section.

Subd. 2. **Automatic dialing-announcing device.** "Automatic dialing-announcing device" means a device that selects and dials telephone numbers and that, working alone or in conjunction with other equipment, disseminates a prerecorded or synthesized voice message to the telephone number called.

Subd. 3. **Caller.** "Caller" means a person, corporation, firm, partnership, association, or legal or commercial entity who attempts to contact, or who contacts, a subscriber in this state by using a telephone or a telephone line.

Subd. 4. **Commercial telephone solicitation.** "Commercial telephone solicitation" means any unsolicited call to a residential subscriber when the person initiating the call has not had a prior business or personal relationship with the subscriber, and when the purpose of the call is to solicit the purchase or the consideration of purchase of goods or services by the subscriber. Commercial telephone solicitation does not include calls initiated by organizations listed in section 290.21, subdivision 3, clauses (a) to (e).

Subd. 5. **Subscriber.** "Subscriber" means a person who has subscribed to telephone service from a telephone company or the other persons living or residing with the subscribing person.

**325E.27 USE OF PRERECORDED OR SYNTHESIZED VOICE MESSAGES.**

A caller shall not use or connect to a telephone line an automatic dialing-announcing device unless: (1) the subscriber has knowingly or voluntarily requested, consented to, permitted, or authorized receipt of the message; or (2) the message is immediately preceded by a live operator who obtains the subscriber's consent before the message is delivered. This section and section 325E.30 do not apply to (1) messages from school districts to students, parents, or employees, (2) messages to subscribers with whom the caller has a current business or personal relationship, or (3) messages advising employees of work schedules.

**325E.28 REQUIREMENTS ON AUTOMATIC DIALING–ANNOUNCING DEVICES.**

A caller shall not use an automatic dialing-announcing device unless the device is designed and operated so as to disconnect within ten seconds after termination of the telephone call by the subscriber.

**325E.29 MESSAGE REQUIREMENTS.**

Where the message is immediately preceded by a live operator, the operator must, at the outset of the message, disclose:

(1) the name of the business, firm, organization, association, partnership, or entity for which the message is being made;

(2) the purpose of the message;

(3) the identity or kinds of goods or services the message is promoting; and

pendency of this proceeding violates the first amendment of the United States Constitution or article I, section 3 of the Minnesota Constitution. The court of appeals concluded that the ADAD statute withstands commercial speech scrutiny. We affirm.

ADADs are machines that select telephone numbers by computer program and dial those numbers consecutively, at random, or at predetermined intervals (e.g., every tenth number). If the machine selects a number that is busy, it disconnects and immediately dials the next programmed number, returning to the previously engaged number at a later time. If the machine reaches a telephone to which no one responds, it disconnects after a predetermined number of rings and returns to that number at a later time. If the machine reaches a telephone to which a subscriber responds, a prerecorded message is played. Should the subscriber hang up in the course of the message, defendant Hall claims the machine automatically disconnects and dials the next programmed number. Should the subscriber listen to the entire message, he or she will be provided telephone numbers to call for further information. According to defendant Hall ADADs can be programmed to exclude the telephone numbers of persons who do not want to be called by the machine.

Each ADAD machine is capable of making up to 1,500 telephone calls per day. The record does not reveal how many ADADs Hall operates, but he states that during November and December 1990 he was able to place from 28,000 to 32,000 ADAD generated calls per day. Hall alleges these calls resulted in approximately 25 positive responses per day per machine.

In response to several complaints, including those made by the patients and staff of Abbott–Northwestern Hospital, the Minnesota Attorney General's Office Consumer Division conducted an investigation which revealed that ADAD generated telephone calls originated from Hall's house in St. Paul, Minnesota. After an investigator from the attorney general's office had made several unsuccessful attempts to speak to him, the state ordered Hall to appear at a deposition, but he refused to do so without compensation.

Hall does business as 721 Associates and Associated Marketing—organizations which distribute commercial telephone solicitations. Casino Marketing Group, Inc., based in Nevada, and Universal American Credit Card, Inc., based in Texas, engaged Hall's service, providing him with a prerecorded sales message to be conveyed by telephone. The Nevada-based business hoped to locate persons who would purchase a travel package to Las Vegas and the Texas-based business hoped to locate persons with no credit history or a poor credit rating who would purchase its credit cards and attendant goods.

On October 30, 1990 the state served on Hall a summons and complaint in which he and Casino Marketing Group, Inc. were named defendants and a summons and complaint in which he and Universal American Credit Card, Inc. were named defendants. In both actions the state sought a declaration that Hall's conduct violates Minn.Stat. §§ 325E.26–.31, an order enjoining defendants from using ADADs in violation of the statute, and a monetary award. Pursuant to Minn.Stat. § 8.31, subd. 3, the state concurrently brought a motion for a temporary injunction to enjoin Hall's use of ADADs pending trial on the merits. Hall counterclaimed under 42 U.S.C. § 1983, arguing that the ADAD statute is unconstitutional on its face and as applied on the ground that it violates the first amendment of the United

(4) if applicable, the fact that the message intends to solicit payment or commitment of funds.

**325E.30 TIME OF DAY LIMIT.**

A caller shall not use an automatic dialing-announcing device nor make any commercial telephone solicitation before 9:00 a.m. or after 9:00 p.m.

**325E.31 REMEDIES.**

A person who is found to have violated sections 325E.27 to 325E.30 is subject to the penalties and remedies, including a private right of action to recover damages, as provided in section 8.31.

States Constitution and Minnesota Constitution article I, section 3.[2] He sought a declaration that the statute is unconstitutional, an order enjoining enforcement of the statute, and money damages.

The cases were consolidated for a hearing on the merits of cross motions for a temporary injunction. On April 4, 1991 the trial court, finding that the statute was consonant with commercial speech protection, temporarily enjoined Hall from using his ADADs for commercial solicitation; the court of appeals affirmed.

The standards for issuance and review of a temporary injunction are well established. *See Thompson v. Barnes,* 294 Minn. 528, 200 N.W.2d 921 (1972); *Dahlberg Bros., Inc. v. Ford Motor Co.,* 272 Minn. 264, 137 N.W.2d 314 (1965). Hall, however, does not challenge the trial court's order on grounds that the state failed to show the traditional prerequisites for issuance of a temporary injunction, but instead argues that the statute on which the temporary injunction is grounded violates free speech principles on its face and as applied.

■ Because the record is not fully developed, we cannot adjudicate conclusively the merits of the state's contention that the messages disseminated by Hall's ADADs are false or misleading. In limiting its review to that appropriate for a temporary injunction motion, the trial court concluded that the evidence before it was insufficient to ascertain whether the speech sponsored by Casino Marketing Group, Inc. and Universal American Credit Card, Inc. was false and misleading and whether the ADAD statute would result in a "total loss" of income from commercial telephone solicitation. Inasmuch as the record accompanying a temporary injunction is necessarily limited and because the state moved for a temporary injunction in response to conduct which neither party argues fell outside the provisions of the ADAD statute, absence of a complete factual record does not provide any basis for overturning the trial court's ruling on the temporary injunction motions. At the same time, of course, we cannot make factual determinations, and we leave them to the appropriate finder of fact. Nonetheless, we may—and indeed must—deliberate on whether the ADAD statute passes first amendment scrutiny.

■ At the outset, we reject the court of appeals' determination that the trial court properly concluded that in the face of first amendment challenges Minn.Stat. §§ 325E.26–.31 enjoy a presumption of constitutionality which remains in force until the contrary is established beyond a reasonable doubt. *State v. Casino Marketing Group, Inc.,* 475 N.W.2d 505, 508 (Minn. App.1991). Although this presumption of constitutionality is well established in the ordinary case, *see, e.g., Dimke v. Finke,* 209 Minn. 29, 32, 295 N.W. 75, 78 (1940), "any provision of law restricting [first amendment] rights does not bear the usual presumption of constitutionality normally accorded to legislative enactments." *Johnson v. State Civil Service Dept.,* 280 Minn. 61, 66, 157 N.W.2d 747, 751 (1968); *see also Alexander v. City of St. Paul,* 303 Minn. 201, 211, 227 N.W.2d 370, 375 (1975). The presumption of constitutionality cannot be reconciled with the unique protections afforded by the first amendment. The principle enunciated in *Johnson* is equally compelling when the speech affected is commercial speech, for a strong presumption in favor of the constitutionality of a statute governing commercial speech would run an unacceptable risk of chilling protected speech. The district court's error of law, however, neither necessarily invalidates its holding nor prohibits this court from reach-

2. In *State v. Century Camera, Inc.,* 309 N.W.2d 735, 738 n. 6 (Minn.1981), a case concerning commercial speech, this court stated, "The protection of freedom of speech guaranteed by Minn. Const. art. I, § 3 is no more extensive in this case than the protection provided by the first amendment to the United States Constitution." Because we are in general accord with the United States Supreme Court's declination to extend the full force of free speech protection to commercial speech and because, beyond peradventure, the speech at issue is commercial speech, we see no reason to interpret the two constitutional provisions differently for the purposes of this case. Thus, this decision's reference to the first amendment should be read as also referencing Minn. Const. art. I, § 3.

ing the merits of this controversy; rather, in light of Hall's legitimate free speech challenge, we proceed with the understanding that the state bears the burden of establishing the statute's constitutionality.

 When contemplating first amendment challenges, the level of judicial scrutiny varies with the type of speech at issue. Minn.Stat. §§ 325E.26–.31 (1990) and the injunction grounded on them bear only upon commercial speech. Commercial speech has been characterized as speech which "does 'no more than propose a commercial transaction,'" *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976) (quoting *Pittsburgh Press Co. v. Human Relations Commission*, 413 U.S. 376, 385, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669 (1973)), or as "expression related to the economic interests of the speaker and its audience." *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 561, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980). We need not, however, linger on definitional nuances, for whatever the characterization of commercial speech, it is clear that the regulatory scope of the ADAD statute is limited to commercial speech. Sections 325E.26–.31 regulate the use of ADADs for

> '[C]ommercial telephone solicitation' [— i.e.,] any unsolicited call to a residential subscriber when the person initiating the call has not had a prior business or personal relationship with the subscriber, and when the purpose of the call is to solicit the purchase or the consideration of purchase of goods or services by the subscriber.

Minn.Stat. § 325E.26, subd. 4 (1990). The statute goes on to except from the definition of "commercial telephone solicitation" "calls initiated" by charitable, religious, educational, and other "organizations listed in section 290.21, subdivision 3, clauses (a) to (e)." *Id.*

Minn.Stat. § 325E.27 (1990) proscribes use of an ADAD unless the subscriber has knowingly or voluntarily requested or consented to receive the message, or unless the message is immediately preceded by a live operator who obtains the subscriber's consent before delivering the prerecorded message. Neither the prohibition in section 325E.27 nor the time limitations set out at section 325E.30 apply to "(1) messages from school districts to students, parents or employees; (2) messages to subscribers with whom the caller has a current business or personal relationship; or (3) messages advising employees of work schedules." Of course, none of the three types of messages excepted from application of section 325E.27 come within the statutory definition of "commercial telephone solicitation," regardless of the content of the message. In each situation the person or entity initiating the call has what can be characterized as an existing business or personal relationship with the recipient. Minn.Stat. § 325E.26–.31 regulates only the use of ADADs to disseminate unsolicited messages which are designed to stimulate the purchase of goods or services for the seller's profit, speech which falls squarely within the confines of any definition of commercial speech.

 Although the defendants challenge the constitutionality of Minn.Stat. §§ 325E.26–.31 as it is applied to their use of ADADs, their contention is based on the premise that the statute imposes a prior restraint on speech. It is important to observe, however, that although the ADAD statute regulates a type of commercial speech, it does not ban it. Rather, the statute posits reasonable time, place, and manner restrictions. The time of day limitation provides that a "caller shall not use an automatic dialing-announcing device nor make any commercial telephone solicitation before 9 a.m. or after 9 p.m." Minn.Stat. § 325E.30 (1990). The ADAD statute owes its existence in large measure to "place" considerations: no place that houses a telephone—be it home, hospital, hotel room, or business quarters and whether the telephone number is listed or unlisted—is immune from intrusion by ADAD. Minn. Stat. § 325E.28 provides that any ADAD in use be designed and operated so as to disconnect within 10 seconds after the sub-

scriber terminates the call, thus assuring that the subscriber's line will be open in the event of an emergency. Finally, and most importantly, Minn.Stat. §§ 325E.27 and 325E.29 (1990) restrict the manner in which ADADs may be used to disseminate commercial speech: either the subscriber must consent in advance or the prerecorded message must be immediately preceded by a live operator, who must disclose the name of the entity for which the message was made, the purpose of the message, the kind of goods or services being promoted, and, if applicable, the fact that payment will be solicited, and then must obtain the subscriber's consent to delivery of the prerecorded message.[3]

Although the statute proposes time, place, and manner restrictions, ultimately the appropriate level of scrutiny of the statute depends on the variety of speech at issue. *See* Rotunda, Nowak, Young, 3 *Treatise on Constitutional Law: Substance and Procedure* 33 (1986).

Both the United States Supreme Court and this court have stopped far short of extending absolute free speech protection to commercial speech: "Commercial speech is given 'a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, * * * allowing modes of regulation that might be impermissible in the realm of noncommercial expression.'" *State v. Century Camera, Inc.*, 309 N.W.2d 735, 739 (Minn.1981) (quoting *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978)). Accordingly, we have adopted the *Central Hudson* test, with its balancing of interests, for assessing the constitutionality of commercial speech regulation:

For commercial speech to come within [first amendment protection], it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson Gas & Electric Corp.*, 447 U.S. at 566, 100 S.Ct. at 2351. This court has repeatedly invoked the *Central Hudson* test in ascertaining the constitutionality of commercial speech regulation, doing so most recently in *Minnesota League of Credit Unions v. Minn. Dept. of Commerce*, 486 N.W.2d 399 (Minn.1992).

If, as the state alleges, it should ultimately be determined that the defendants' messages are false or misleading, then they are not entitled to any first amendment protection. *Central Hudson*, 447 U.S. at 563, 100 S.Ct. at 2350. The truth or falsity of defendants' prerecorded messages has not, however, yet been determined; therefore, for purposes of this opinion, we assume that they are neither false nor misleading.

Irrespective of the veracity of the content of the defendants' travel package and credit card solicitation, it is clear that the ADAD statute contemplates restricting the dissemination of truthful commercial speech by automatic dialing-announcing devices. To undertake regulation "[t]he State must assert a substantial interest to be achieved by restrictions on commercial speech." *Central Hudson Gas & Electric Corp.*, 447 U.S. at 564, 100 S.Ct. at 2350. The state asserts two substantial interests

3. Minnesota is hardly alone in voicing concern over the proliferation of ADADs. The federal government and over 40 states have enacted legislation limiting the use of ADADs. S.Rep. No. 178, 102d Cong., 1st Sess. 3 (1991), U.S.Code Cong. & Admin.News 1991, pp. 1968, 1970. The authors of the federal statute which regulates use of ADADs—the Telephone Consumer Protection Act of 1991 (effective December 20, 1992)— chose not to limit its regulatory scope to commercial speech, but rather, among other things, banned *all* computer generated calls to homes

unless such a call is made for emergency purposes or the subscriber consents in advance to it. 47 U.S.C.A. § 227(b)(1)(B). Thus, the act does not permit ADAD communication to homes even if such communication is introduced by a live operator and it extends to noncommercial speech. The authors anticipate that any constitutional challenge to the act will fail because it posits valid time, place, and manner restrictions. S.Rep. No. 178, 102d Cong., 1st Sess. 4 (1991). The act does not preempt state ADAD regulations. 47 U.S.C.A. § 227(e)(1).

underlying Minn.Stat. §§ 325E.26–.31: protection of privacy in the home and prevention of telemarketing fraud. We conclude that the state has a substantial interest in both respects. *See Frisby v. Schultz*, 487 U.S. 474, 484–85, 108 S.Ct. 2495, 2502, 101 L.Ed.2d 420 (1988) ("[A] special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions."); *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 636, 100 S.Ct. 826, 835, 63 L.Ed.2d 73 (1980) (the governmental interest in protecting the public from fraud is "indeed substantial").

Although the ADAD statute undoubtedly deters telemarketing fraud, we conclude that the requirement which the defendants assert is most onerous, that a live operator introduce an ADAD generated prerecorded commercial solicitation, has little relationship to its fraud deterrence features. The disclosures to be made by a live operator are designed to minimize the opportunity for fraud, but although the requirement of disclosure is not constitutionally infirm in itself, *see Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651, 105 S.Ct. 2265, 2281, 85 L.Ed.2d 652 (1985), the requirement that these disclosures be made by a live operator does little, if anything, to directly advance the state's interest in fraud prevention. As long as the mandated disclosures are placed at the beginning of an ADAD generated commercial solicitation and are understandable, it seems to us the state's substantial interest in fraud deterrence would be served equally well whether the disclosures be made by a live operator or a prerecorded voice. Indeed, a skilled live operator might well subvert the aims of the disclosures if given the opportunity to engage the subscriber in conversation. Thus, it is doubtful that the ADAD statute would pass constitutional muster were the prevention of fraud the only legitimate interest to be served.

But although the ADAD statute appears only incidentally to further the state's interest in fraud prevention, it directly advances the state's interest in protecting residential privacy. The necessity for protecting residential privacy is driven not so much by offensiveness of the content of the message as by the coupling of commercial telephone solicitation with a startlingly efficient and indiscriminate medium of distribution,[4] so that the resulting *method* of conveying commercial speech intolerably encumbers fundamental notions of residential privacy.

The telephone is unique in its capacity to bring those outside the home into the home for direct verbal interchange—in short, the residential telephone is uniquely intrusive. The caller, who can convey messages which very young children can understand, is able to enter the home for expressive purposes without contending with such barriers as time or distance, doors or fences. We do not take this verbal presence lightly: "The ancient concept that 'a man's home is his castle' into which 'not even the king may enter' has lost none of its vitality, * * * *" *Rowan v. Post Office Dept.*, 397 U.S. 728, 737, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970). Moreover, the shrill and imperious ring of the telephone demands immediate attention. Unlike the unsolicited bulk mail advertisement found in the mail collected at the resident's leisure, the ring of the telephone mandates prompt response, interrupting a meal, a restful soak in the bathtub, even intruding on the intimacy of the bedroom. Indeed, for the elderly or disabled, the note of urgency sounded by the ring of the telephone signals a journey which may subject the subscriber to the risk of injury. Unlike the radio or the television, whose delivery of speech, either commercial or noncommercial, depends on the listener's summons, the telephone summons the subscriber, depriving him or her of the ability to select the expression to

---

**4.** Public Law 102–243 (1991), the Telephone Consumer Protection Act of 1991, includes Congress' finding that: "More than 300,000 solicitors call more than 18,000,000 Americans everyday." 105 Stat. 2394, § 2(3) (1991). "[I]f you had 193 [ADADs], they would be able to call every home in the U.S. once a week." Congressman Les Aspin, quoted in U.S. News & World Rep., Sept. 11, 1987 at 44.

which he or she will expose herself or himself.

As Justice William O. Douglas observed in his concurring opinion in *Lehman v. City of Shaker Heights*, 418 U.S. 298, 307, 94 S.Ct. 2714, 2719, 41 L.Ed.2d 770 (1974) (statute prohibiting political advertisements on city buses held a valid time, place, and manner restriction), "the petitioner overlooks the constitutional rights of the commuters. * * * * [H]e has no right to force his message upon an audience incapable of declining to receive it." But, contend the defendants here, the subscriber is quite capable of declining to receive an ADAD generated commercial telephone solicitation. The subscriber need only hang up the telephone. Although it is true that the subscriber can elect not to listen to the entire sales message, Justice Douglas' "captive audience" observation is nevertheless appropriate here because the subscriber has been forced to answer the telephone and receive at least part of the message before he or she can hang up on the unsolicited call. Inasmuch as the interior of the subscriber's home is not a public forum, reasonable time, place and manner regulation of unsolicited commercial telephone solicitation ought to be permissible.

Minn.Stat. § 325E.26–.31 (1990) is not directed at all persons who communicate by telephone but only at those who choose to advertise goods and services by dispensing ADAD generated messages over telephone lines. In two fundamental ways, ADAD generated telephone calls differ from telephone calls generated by live operators: in a very short period of time ADADs reach an astonishing number of households selected at random. Using ADADs, Hall claims to have reached 28,000 to 32,000 telephones per day. Furthermore, this immense volume of telephone calls is controlled by machines which have no ability to differentiate.[5] Should the machine engage a number, it almost unfailingly delivers its message to a child,[6] to the subscriber who pays for an unlisted telephone number,[7] to an answering machine, to a fax machine, or to the owner of a cellular telephone, who must pay for the call. Moreover, although Hall alleges that his ADADs comply with the statutory requirement that ADADs disconnect within 10 seconds after the subscriber hangs up, the less sophisticated but more popular ADADs continue to engage the subscriber's telephone until the entire message has been played, rendering the subscriber's telephone inoperable for the duration of the message. One mother in Amsterdam, New York is said to have nearly lost her child because of an ADAD's failure to disconnect. When the child became ill, the mother tried to summon help by telephone only to be met by a prerecorded sales pitch. Because attempts to hang up on the inexorable message were futile, the mother

**5.** The United States Senate report lists the following problems with ADAD use:
- automated calls are placed to lines reserved for emergency purposes, such as hospitals and fire and police stations;
- the entity placing the automated call does not identify itself;
- the automated calls fill the entire tape of an answering machine, preventing other callers from leaving messages;
- the automated calls will not disconnect the line for a long time after the called party hangs up the phone, thereby preventing the called party from placing his or her own calls;
- *automated calls do not respond to human voice commands to disconnect the phone*, especially in times of emergency;
- some automatic dialers will dial numbers in sequence, thereby tying up all the lines of a business and preventing any outgoing calls; and
- unsolicited calls placed to fax machines, and cellular or paging telephone numbers often impose a cost on the called party (fax messages require the called party to pay for the paper used, cellular users must pay for each incoming call, and paging customers must *pay to return the call to the person who* originated the call).

S.Rep. No. 178, 102d Cong., 1st Sess. 2 (1991), U.S.Code Cong. & Admin.News 1991, p. 1969.

**6.** One ADAD, for example, managed to sell a subscription to *Playboy* to a 3–year-old. Barron, *Junk Phone Calls: Danger on the Line?*, N.Y. Times, May 29, 1988, § 1, at 36, col. 1.

**7.** It might be supposed that an unlisted telephone number represents a request that the subscriber not be bombarded by unsolicited sales pitches. Not so.

saved her child by running to a neighbor's home to call for an ambulance.[8]

By requiring a live operator to introduce commercial telephone solicitations, the ADAD statute reasonably accommodates two fundamental interests: it balances the value of disseminating commercial telephone solicitations with remarkable efficiency against the value of residential privacy and it counteracts the indiscriminate dispensing of commercial telephone solicitations. Requiring a live operator to introduce ADAD generated commercial solicitation undoubtedly adversely affects ADAD's capacity to transmit messages ceaselessly. Inasmuch as the intrusiveness of commercial telephone solicitation flows in large measure from the necessity of immediate response to the ring of the telephone, this reduction in the efficiency with which commercial telephone solicitations are made directly and not unreasonably advances the state's interest in protecting residential privacy. Moreover, by requiring live operators to initiate commercial solicitation by telephone, the statute addresses the inescapable fact that machines cannot ascertain the propriety of proceeding with a message, and it thereby further directly advances the state's interest in the maintenance of privacy.

The contention that the ADAD statute fails to directly advance the state's interest because commercial telephone solicitations generated by live operators intrude upon privacy to the same extent as ADAD generated commercial telephone solicitations is overly simplistic. The quality of intrusion by commercial telephone solicitation initiated by a live operator differs from that of an ADAD generated call although the degree to which privacy is invaded by any particular call may be the same. Nevertheless, this observation is just an observation, for it is not dispositive of whether the ADAD statute directly advances the state's interest in protecting privacy. A regulation of commercial speech does not fail to directly advance the state's substantial interest merely because it does not eradicate all the evils that offend that interest. In *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), the Supreme Court applied the *Central Hudson* test to that portion of a city ordinance that prohibited offsite billboards which disseminated commercial speech, but that allowed onsite billboards which disseminated commercial speech. In response to the argument that onsite advertising is as offensive to aesthetics and safety as offsite advertising, the Court noted, (1) onsite advertising aside, the prohibition of the ordinance of offsite billboards directly advances the state's objectives of promoting safety and aesthetics; (2) the city is free to believe that offsite advertising is a more acute problem than onsite advertising; and (3) the city is free to value one variety of dispensing commercial speech more highly than another. *Id.* at 510–12, 101 S.Ct. at 2893–95. *See also Posadas de Puerto Rico Assoc. v. Tourism Co.*, 478 U.S. 328, 342–43, 106 S.Ct. 2968, 2977–78, 92 L.Ed.2d 266 (1985) (statute which prohibits casino gambling advertising within Puerto Rico directly advances the state's interest even though advertising of other forms of gambling is permitted).

Similarly misplaced is the contention that the ADAD statute fails to directly advance the state's interest because telephone solicitations by charitable and other organizations listed in section 290.21, subdivision 3, clauses (a) to (e) are excepted from the definition of "commercial telephone solicitation." Charitable solicitation aside, the restriction on ADAD use directly advances the state's objective of protecting residential privacy by reducing the number of unsolicited commercial telephone calls. The state is free to believe that commercial telephone solicitation is a more acute problem than charitable telephone solicitation; and the legislature is free to determine that in the light of Minnesotans' recognized sense of community, the enhancement of the quality of life in this state by charitable contributions is of greater value than gen-

---

**8.** Barron, *Junk Phone Calls: Danger on the Line?*, N.Y. Times, May 29, 1988, § 1, at 36, col. 1.

erating profit through commercial telephone sales messages. *Metromedia, Inc. v. City of San Diego*, 453 U.S. at 510–12, 101 S.Ct. at 2893–95. In *Posadas de Puerto Rico Assoc. v. Tourism Co.*, 478 U.S. 328, 106 S.Ct. 2968, a casino prohibited from advertising its gambling facilities inside Puerto Rico challenged the advertising restrictions as underinclusive because other kinds of gambling such as horse racing, cock fighting, and the lottery could be advertised to residents of Puerto Rico. The Supreme Court held that "whether other kinds of gambling are advertised in Puerto Rico or not, the restrictions on advertising of casino gambling 'directly advance' the legislature's interest in reducing demand for games of chance." 478 U.S. at 342, 106 S.Ct. at 2977. Because horse racing, cock fighting, small games of chance at fiestas, and the lottery were traditionally part of the Puerto Rican culture, the Court viewed the separate classification of casino gambling, for purposes of the advertising ban, as satisfying the third step of the *Central Hudson* analysis. 478 U.S. at 343, 106 S.Ct. at 2977. And as the Supreme Court said in *Metromedia*, it does not follow from the fact that the state has concluded that the support of organizations listed in section 290.21, subdivision 3, clause (a) to (e) outweigh its interest in residential privacy, that it must give similar weight to commercial telephone solicitation. *Metromedia*, 453 U.S. at 512, 101 S.Ct. at 2895.

It behooves us to remember that when the legislature chooses to restrict commercial speech, it is not required to impose restrictions that protect the state's substantial interest absolutely. ADADs' method of propagating expression, for reasons that are not merely speculative, runs an especially acute risk of intruding on residential privacy. By drafting narrowly tailored restrictions which curtail particularly offensive aspects of ADAD use, the legislature, acting well within the realm of reason, directly advanced the state's substantial interest in protecting privacy.

The fourth and final prong of the *Central Hudson* test requires that the means of advancing the governmental interest be "not more extensive than necessary." *Id.*

447 U.S. at 566, 100 S.Ct. at 2351. This is not a "least restrictive means" test, but rather requires that the regulation be narrowly tailored to achieve its purpose:

What our decisions require is a ' "fit" between the legislature's ends and the means chosen to accomplish those ends,'—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' that employs not necessarily the least restrictive means but, as we have put it in the other contexts discussed above, a means narrowly tailored to achieve the desired objective. Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed.

*Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 3035, 106 L.Ed.2d 388 (1989) (citations omitted).

We are satisfied that sections 325E.25–.31 are "narrowly tailored to achieve the desired objective." *Id.* The ADAD statute does not restrict commercial solicitation by live operator, nor does it prohibit commercial solicitation by ADAD. Absent advance consent, it requires that the ADAD operator introduce the tape-recorded message by a live operator, that the live operator make certain disclosures, and that the live operator call at a decent hour. The ADAD statute posits no blanket proscriptions on computer generated commercial telephone solicitation, but rather it narrowly regulates those facets of ADAD use that are most susceptible to violating privacy. *See Metromedia, Inc.*, 453 U.S. at 508, 101 S.Ct. at 2893; *Posadas de Puerto Rico Association*, 478 U.S. at 343–44, 106 S.Ct. at 2977–78. As such, it is carefully calculated to advance the state's substantial interest in protecting privacy, and thus withstands scrutiny under the fourth prong of the *Central Hudson* test.

Having concluded that the ADAD statute does not unconstitutionally offend commercial speech protection, we hold that Minn. Stat. §§ 325E.26–.31 meet the standards

set out in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980): Assuming that the defendants' prerecorded messages are neither false nor misleading and are, therefore, entitled to constitutional protection, the government interest in the protection of privacy in the home is substantial; the time, place, and manner requirements directly advance the protection of residential privacy, and the regulation is narrowly drawn and is not more excessive than necessary to serve that interest. Because this is an interlocutory appeal, we remand to the trial court for conclusion of the proceedings, with the expectation that the finder of fact will determine whether the prerecorded messages in question are accurate and nondeceptive or whether they are false and misleading.

Affirmed.

TOMLJANOVICH, Justice (concurring in part and dissenting in part).

I share the majority's frustration with intrusive telephone solicitations. But I do not agree that the provision requiring that a live operator obtain consent before a message is played complies with the freedom of speech requirements placed on the states by the First and Fourteenth Amendments. Therefore, I respectfully dissent from the portions of the majority's opinion which hold that the live operator provisions are constitutional.

I agree with the majority that the state may place more restrictions on commercial speech than on political speech. I also agree that the provisions mandating that ADAD's disconnect within ten seconds after termination of the call by the recipient and limiting the use of ADAD's to certain hours of the day are constitutional because they further the state's substantial interest in protecting privacy and safety.

I do not believe, however, that the live operator requirements are constitutional. Under *Central Hudson*, if commercial speech is not deceptive, the state can regulate it only to further a substantial state interest. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S.

557, 564, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980). I heartily agree with the majority that the state has a substantial interest in protecting the privacy of its citizens.

But even when the state demonstrates a substantial interest, a statute regulating commercial speech must "directly advance" that interest to be valid. *Id.* A regulation of commercial speech "may not be sustained if it provides only ineffective or remote support for the government's purpose." *Id.* The majority holds that the privacy interest being advanced is the interest in being free of interruptions from "the shrill and imperious ring of the telephone." But the live operator requirements advance that interest only incidentally, if at all. Once the person being called picks up the telephone, the interruption of privacy already has occurred. At that point, from a privacy perspective, it makes no difference whether the caller is a person or a machine. The damage to privacy is done, and the solution is the same in either situation: hang up the telephone. In this respect, Casino's solicitations are quite possibly less intrusive than live callers: I suspect that most people can hang up on a machine more easily and more quickly than they could on a live operator. Thus, I believe this is precisely the type of "ineffective" regulation discussed in *Central Hudson* because, in all likelihood, the live operator requirement actually intrudes upon rather than protects privacy.

The majority also argues that by forcing telephone solicitors to hire live operators, fewer calls will be made and the privacy of the citizens will be protected. But this regulation allows those who use ADAD's to make just as many calls as before if they are willing to hire live operators. Thus, I do not see how this requirement protects privacy. It simply makes commercial speech more expensive than it would be without the live operator requirement.

Finally, *Central Hudson* requires that regulation of commercial speech must not be "more extensive than is necessary" to serve the state's substantial interest. *Id.* at 566, 100 S.Ct. at 2351. That language has recently been construed to mean that

the limitation on speech must be a "reasonable fit" to the state interest being advanced. *Board of Trustees, State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 3034, 106 L.Ed.2d 388 (1989). The live operator requirements fail on this ground as well. When the live operator requirements are subjected to any meaningful level of judicial scrutiny, it is clear that they do not further the state's interest in protecting the privacy of its citizens. I simply cannot imagine how a statute that does not directly advance and perhaps impedes the state's purported interest can possibly meet the "reasonable fit" requirement of *Fox.*

I respectfully dissent and would hold the live operator requirements unconstitutional.