79 F.3d 942
 64 USLW 2625, 24 Media L. Rep. 1592,
96 Cal. Daily Op. Serv. 2224,
96 Daily Journal D.A.R. 3726
 William BLAND and National Association Of Telecomputer
Operators, Plaintiffs-Appellants,
v.
Daniel William FESSLER; P. Gregory Conlon; Norman D.
Shumway; Jessie J. Knight Jr.; and Patricia M. Eckart, in
their individual and official capacities as Public Utilities
Commissioners; Daniel E. Lungren, in his official capacity
as Attorney General of the State of California, Defendants-Appellees.
 No. 95-55522.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 17, 1995.
Decided April 1, 1996.
 
 Rex S. Heinke, Gibson, Dunn & Crutcher, Los Angeles, California, for plaintiffs-appellants.
 Ronald A. Reiter, Deputy Attorney General, Los Angeles, California, and Mark Fogelman, California Public Utilities Commission, San Francisco, California, for defendants-appellees.
 Appeal from the United States District Court for the Central District of California; Edward Rafeedie, District Judge, Presiding.
 Before: FLETCHER, CANBY, and HAWKINS, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 Plaintiffs appeal the grant of summary judgment dismissing their action against the Commissioners of the California Public Utilities Commission and the dismissal on a Rule 12(b)(6) motion of their action against the Attorney General of California. Plaintiffs' action challenges on First Amendment grounds two California statutes that regulate Automatic Dialing and Announcing Devices ("ADADs"), machines that dial telephone numbers and deliver prerecorded messages. We affirm both decisions of the district court, but affirm the dismissal of the action against the Attorney General on different grounds from those relied on by the district court.
 
 I. FACTS AND PRIOR PROCEEDINGS
 
 2
 William Bland used ADADs to advertise his carpet cleaning services. Bland's ADADs provoked consumer complaints to the telephone company. One telephone user reported he could not terminate calls from Bland's ADADs: "I hung up my telephone several times, but the recording continued and tied up my line for at least a couple of minutes." This consumer also complained that Bland's ADADs were extremely misleading as to the identity of the calling party. In May 1994, the telephone company notified Bland that his use of ADADs violated California law and threatened to disconnect his telephones if he didn't stop using them. Bland immediately stopped using his ADADs.
 
 
 3
 Two California statutes prohibit the use of ADADs unless a live operator first identifies the calling party and obtains the called party's consent to listen to the prerecorded message. Cal.Pub.Util.Code § 2874(a) ("the utilities statute")[1]; Cal.Civ.Code § 1770(v)(1) ("the civil statute").[2] The California Public Utilities Commission may enforce the utilities statute with fines and disconnection of telephone service. Cal.Pub.Util.Code § 2876. The California Attorney General may enforce the civil statute with fines, Cal.Bus. & Prof.Code § 17200 et seq., and citizens injured by violations of the civil statute may file suit for damages, Cal.Civ.Code §§ 1780-1784.
 
 
 4
 The State of California is not alone: Congress has also restricted the use of ADADs, 47 U.S.C. § 227 (the Telephone Consumer Protection Act of 1991), as have more than forty states, S.Rep. No. 102-178, 102d Cong., 1st Sess. (1991), reprinted in 1991 U.S.C.C.A.N. 1968, 1970. ADADs are common; hundreds of thousands of solicitors have used them to contact millions of people. Id. The California legislature found that "[u]nsolicited prerecorded calls are a source of great aggravation to many people, interrupting their affairs and tying up their lines." California Senate Comm. Report on Assembly Bill 4084. Congress found that ADAD calls are annoying and disruptive in the following ways:
 
 
 5
 . automated calls are placed to lines reserved for emergency purposes, such as hospitals and fire and police stations;
 
 
 6
 . the entity placing the automated call does not identify itself;
 
 
 7
 . the automated calls fill the entire tape of an answering machine, preventing other callers from leaving messages;
 
 
 8
 . the automated calls will not disconnect the line for a long time after the called party hangs up the phone, thereby preventing the called party from placing his or her own calls;
 
 
 9
 . automated calls do not respond to human voice commands to disconnect the phone, especially in times of emergency;
 
 
 10
 . some automatic dialers will dial numbers in sequence, thereby tying up all the lines of a business and preventing any outgoing calls; and
 
 
 11
 . unsolicited calls placed to fax machines, and cellular or paging telephone numbers often impose a cost on the called party....
 
 
 12
 S.Rep. No. 102-178, reprinted in 1991 U.S.C.C.A.N. at 1969.
 
 
 13
 In October 1994, Bland and the National Association of Telecomputer Operators ("NATO")[3] sued the Commissioners and the Attorney General of California in federal district court, alleging that both of California's ADAD statutes violate the First and Fourteenth Amendments to the United States Constitution. In March 1995, the court upheld both statutes, granting the Commission's motion for summary judgment pursuant to Rule 56, and granting the Attorney General's motion to dismiss pursuant to Rule 12(b)(6). Plaintiffs appeal. The attorney general urges on appeal that the dismissal of the action against him should have been for lack of standing, rather than failure to state a claim.[4]
 
 II. DISCUSSION
 
 14
 The appeal presents these questions: Do the plaintiffs have standing to challenge the civil statute? Is the utilities statute constitutional?[5]
 
 A. STANDING TO CHALLENGE THE CIVIL STATUTE
 
 15
 The Attorney General argues on appeal that because his office has never enforced the civil statute and has no plans to do so, we should dismiss the action against him for lack of standing. We agree.
 
 
 16
 Standing is reviewed de novo. Hong Kong Supermarket v. Kizer, 830 F.2d 1078, 1080 (9th Cir.1987). "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). However, "when reviewing a motion to dismiss pursuant to Rule 12(b)(1) the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." McCarthy v. United States, 850 F.2d 558, 560 (9th Cir.1988), cert. denied, 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989).[6]
 
 
 17
 To establish standing, the plaintiffs must prove 1) they have suffered an "injury in fact," 2) there is a causal nexus between the injury and the defendant's conduct, and 3) a favorable decision will likely remedy the injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136-37, 119 L.Ed.2d 351 (1992). Whether the plaintiffs suffer injury in fact from a statute that has not yet been enforced turns on whether there is "a genuine threat that the allegedly unconstitutional law is about to be enforced against [them]." Stoianoff v. Montana, 695 F.2d 1214, 1223 (9th Cir.1983); see also Babbitt v. United Farm Workers, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979) (standing to challenge unenforced statute requires proof enforcement is "certainly impending") (citations omitted).
 
 
 18
 After examining both the pleadings and the other evidence before the district court, we conclude plaintiffs lack standing to challenge the constitutionality of the civil statute because there is no genuine threat that the Attorney General is about to enforce it.[7] While plaintiffs alleged in their complaint and amended complaint that Bland suffered economic injury as a result of the Commission's enforcement of the utilities statute, the only reference to the Attorney General and the civil statute is that the Attorney General is responsible for enforcing it. According to the declaration of Senior Assistant Attorney General Herschel T. Elkins, the Attorney General's office "has not brought or indicated that it would bring any action under [the civil statute] or on any other theory of law related to a person's operation of an ADAD."
 
 
 19
 Whether the Attorney General might seek to enforce the civil statute at some time in the future is unknown.[8] Be that as it may, there is simply no "genuine threat" that the civil statute is "about to be enforced," see Stoianoff, 695 F.2d at 1223, by the Attorney General against Bland or any other member of NATO.
 
 
 20
 B. CONSTITUTIONALITY OF THE UTILITIES STATUTE
 
 
 21
 Plaintiffs argue that California's utilities statute violates the First Amendment. We review determinations as to the constitutionality of a statute de novo. Gray v. First Winthrop Corp., 989 F.2d 1564, 1567 (9th Cir.1993).
 
 
 22
 Two recent decisions guide our analysis: this court's Moser v. FCC, 46 F.3d 970 (9th Cir.1995), and the Eighth Circuit's Van Bergen v. Minnesota, 59 F.3d 1541 (8th Cir.1995), both of which upheld ADAD statutes as permissible time, place, and manner restrictions on speech. Moser concerned a federal ADAD statute, 46 F.3d at 972 (considering 47 U.S.C. § 227), and Van Bergen concerned a Minnesota ADAD statute, 59 F.3d at 1544-45 n. 2 (considering Minn.Stat. §§ 325E.26-.31). Both statutes resemble the statute at bar.
 
 
 23
 The plaintiffs argue that two different decisions ought to guide our analysis: Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943), and Project 80's, Inc. v. City of Pocatello, 942 F.2d 635 (9th Cir.1991), both of which struck down statutes prohibiting door-to-door solicitation. We find Martin and Project 80's inapposite for two reasons.
 
 
 24
 First, compared to door-to-door solicitors, the annoyance and disruption of ADADs is of a different order of magnitude. As the Eighth Circuit explained, ADAD calls create a much greater problem because of their "sheer quantity" and the fact that they offer recipients who want to hang up immediately no opportunity to tell the caller not to call again. Van Bergen, 59 F.3d at 1555. Moreover, while door-to-door solicitation involves a conversation between two people, ADADs involve a one-way onslaught of information. ADADs are less like door-to-door solicitation and more like sound trucks and public address systems, both of which the government may regulate. Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (plurality opinion) (sound trucks); Ward v. Rock Against Racism, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (public address systems).
 
 
 25
 Second, while the statutes in Martin and Project 80's prohibited essentially all door-to-door solicitation,[9] whether or not a homeowner wanted to speak to a solicitor, the statute at bar permits the use of ADADs, so long as the called party consents to listen to the prerecorded message. Central to the door-to-door solicitation decisions were concerns over the dangers of state paternalism that deprives people of information they might wish to receive. Martin, 319 U.S. at 141, 63 S.Ct. at 862 (solicitation should "depend upon the will of the individual master of each household, and not upon the determination of the community"); Project 80's, 942 F.2d at 638-39. In contrast, the California statute makes no decisions for the called parties who remain free to decide for themselves whether or not to listen to prerecorded messages.
 
 
 26
 Thus, Moser and Van Bergen inform our inquiry, and not Martin and Project 80's. However, neither the federal ADAD statute upheld in Moser nor the Minnesota ADAD statute upheld in Van Bergen is identical to the California statute. The federal statute regulates only calls to residences, while the California statute regulates calls to both residences and businesses. Although Minnesota's statute applies to both residences and businesses, its exemptions are different. Accordingly, we must apply discretely to the California statute the "time, place, and manner" test, to determine whether its particular restrictions 1) are content neutral, 2) serve a significant governmental interest, 3) are narrowly tailored to serve this interest, and 4) leave open ample alternative channels of communication. Ward, 491 U.S. at 791, 109 S.Ct. at 2753 (citations omitted).
 
 1. CONTENT NEUTRALITY
 
 27
 For the purposes of analysis, the utilities statute can be divided into its central prohibitory provision and its exemptions.
 
 
 28
 The statute forbids the use of ADADs unless preceded by a live operator who identifies the calling party and obtains the called party's consent to listen to the prerecorded message. Cal.Pub.Util.Code § 2874(a). This provision simply prescribes a method of communication, not its content. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." Ward, 491 U.S. at 791, 109 S.Ct. at 2754.
 
 
 29
 The statute contains two kinds of exemptions, both of which are content neutral. The statute has a global exemption for parties with an existing relationship: "This article does not apply to any [ADAD] ... that is used solely to transmit a message to an established business associate, customer, or other person having an established relationship with the person using the [ADAD]...." Cal.Pub.Util.Code § 2872(f). The statute also exempts calls from nonprofit organizations to their members. Id. at § 2872(d)(2). These exemptions rest not on the content of the message, but on existing relationships implying consent to the receipt of ADAD calls. See Van Bergen, 59 F.3d at 1550 (upholding exemption where "the caller has a relationship with the subscriber implying the subscriber's consent to receive the caller's communications").
 
 
 30
 Other exemptions do relate to content, some involving existing relationships, others not. The statute exempts calls 1) from schools to parents regarding student attendance, 2) from cable and utility companies to customers regarding previously arranged installation of facilities, 3) from petroleum, chemical, and nuclear facilities concerning emergencies, and 4) from police and fire officials concerning public safety and emergencies. Cal.Pub.Util.Code § 2872(d), (e). Although regulating content, all of the exemptions are based on relationships implying consent to receive ADAD calls, or messages the recipient wants to hear, or both: parents want to know of their children's attendance, consumers of cable and utility services want installation information, and everyone wants information concerning public safety and emergencies.
 
 
 31
 Plaintiffs, however, argue that these exemptions improperly privilege some relationships over others. We disagree. The statute exempts ADAD communications between all persons and entities with established relationships. That it exempts some emergency situations and callers but not others[10] is not a fatal flaw. Underinclusiveness of the emergency exemptions cannot possibly indicate a preference for one side of a debate over the other.
 
 
 32
 Plaintiffs also argue that the group-based exemptions improperly contain content-based restrictions. However, the "principal inquiry" in content neutrality cases is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward, 491 U.S. at 791, 109 S.Ct. at 2754. Not a scintilla of evidence suggests that the State of California disapproves of parent-teacher communication regarding student grades, as opposed to the communication about student attendance that the statute permits. Nor do the restrictions on the content of the messages the other exempted groups may convey--cable companies may call only regarding previously arranged service installation, and dangerous facilities may call only regarding disasters--carry the scent of government favoritism in the free market of ideas.
 
 2. THE GOVERNMENT INTERESTS
 
 33
 The State of California has a significant interest in protecting the public from ADAD calls, whether received at home or at work. These machines can generate an incredible volume of prerecorded telephone calls: 200 ADADs could call every home in the United States every week, State by Humphrey v. Casino Marketing Group, 491 N.W.2d 882, 888 n. 4 (Minn.1992), cert. denied, 507 U.S. 1006, 113 S.Ct. 1648, 123 L.Ed.2d 269 (1993), and hundreds of thousands of solicitors use ADADs. S.Rep. No. 102-178, reprinted in 1991 U.S.C.C.A.N. at 1970. Such calls, received at either residences or places of business, have the potential to annoy and disrupt.[11]
 
 
 34
 The Minnesota Supreme Court described the threat posed by telephone solicitation to residential privacy as follows:
 
 
 35
 the residential telephone is uniquely intrusive. The caller ... is able to enter the home for expressive purposes without contending with such barriers as time or distance, doors or fences.... Unlike the unsolicited bulk mail advertisement found in the mail collected at the resident's leisure, the ring of the telephone mandates prompt response, interrupting a meal, a restful soak in the bathtub, even intruding on the intimacy of the bedroom.
 
 
 36
 Casino Marketing, 491 N.W.2d at 888. This court likewise concluded that "Congress accurately identified automated telemarketing calls as a threat to privacy." Moser, 46 F.3d at 974.
 
 
 37
 The State of California's significant interest in protecting residential privacy is well established. "The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order of a free and civilized society." Frisby v. Schultz, 487 U.S. 474, 484, 108 S.Ct. 2495, 2502, 101 L.Ed.2d 420 (1988) (citations omitted). The Supreme Court has repeatedly upheld against First Amendment challenge speech restrictions that seek to protect residential privacy. Id. (upholding residential picketing ban); FCC v. Pacifica Foundation, 438 U.S. 726, 748, 98 S.Ct. 3026, 3039, 57 L.Ed.2d 1073 (1978) (upholding FCC prohibition of indecent speech on the airwaves); Rowan v. U.S. Post Office Dept., 397 U.S. 728, 736-37, 90 S.Ct. 1484, 1490-91, 25 L.Ed.2d 736 (1970) (upholding postal regulation of offensive mail); Kovacs, 336 U.S. at 88-89, 69 S.Ct. at 454-55 (upholding sound truck ban).[12]
 
 
 38
 The State of California's significant interest in protecting the public from ADADs does not end when telephone users leave their homes. ADADs are "a source of great aggravation to many people, interrupting their affairs and tying up their lines." California Senate Comm. Report on Assembly Bill 4084. People receiving ADAD calls are no less aggravated because they are at work and not at home. In residences and in workplaces, ADADs tie up lines, fill up answering machines, and impose costs on the called parties. S.Rep. No. 102-178, reprinted in 1991 U.S.C.C.A.N. at 1970. Indeed, "business subscribers believe that these calls are an impediment to interstate commerce." Id. at 1969.
 
 
 39
 The State of California's significant interest in protecting people at work from the annoyance and disruption of ADADs is well grounded in law. The Eighth Circuit held in Van Bergen that
 
 
 40
 individuals at work in private businesses are entitled to expect that they will not be disturbed except by personal or business invitees, just as, at their residence, they are entitled to expect privacy. Cf. Mancusi v. De Forte, 392 U.S. 364, 369, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154 (1968) (holding that the occupant of an office has standing to challenge warrantless search of his office because entitled to expect only invitees to enter his office).
 
 
 41
 59 F.3d at 1554 (full citation omitted).[13] Moreover, speakers have no right to turn people who are outside of their homes into a "captive audience" that is "incapable of declining to receive" a message. Lehman v. City of Shaker Heights, 418 U.S. 298, 306, 94 S.Ct. 2714, 2718, 41 L.Ed.2d 770 (1974) (Douglas, J., concurring) (upholding a ban on political advertisements on car cards on buses because commuters are a captive audience). The Minnesota Supreme Court has noted that ADADs turn telephone users into a "captive audience." Casino Marketing, 491 N.W.2d at 889.
 
 3. NARROWLY TAILORED
 
 42
 The California statute substantially promotes the government's interest in protecting telephone users at home and at work from the annoyance and disruption of ADAD calls. By requiring ADAD users to obtain the called party's consent before playing a prerecorded message, the statute allows telephone users to avoid ADAD messages they don't want to hear, and prevents the problems caused by unregulated ADADs (e.g. filled-up answering machines, failures to disconnect, tied up lines, and attendant costs and inconveniences imposed on called parties).
 
 
 43
 The statute is narrowly tailored to achieve its goals. While time, place, and manner restrictions on speech that "disregard far less restrictive and more precise means are not narrowly tailored," Project 80's, 942 F.2d at 638, they need not be "the least restrictive or least intrusive means" of accomplishing the government's goals. Ward, 491 U.S. at 798, 109 S.Ct. at 2757.
 
 
 44
 Here, no less restrictive means of accomplishing the government's objectives is readily apparent. Neither alternative strategy proposed by the plaintiffs--"do not call" lists and self-help--can effectively protect privacy in the home and workplace. A "do not call" list would place the burden on the public to stop disruptive ADAD calls from arriving at homes and places of work. Moreover, a "do not call" list would force people to make an all-or-nothing choice about prerecorded messages, while California's statute allows people to choose to hear some but to reject others.
 
 
 45
 The plaintiffs also suggest that the state government eschew legislation and allow people to protect themselves from ADADs as they see fit by turning off their ringers, screening their calls with answering machines, or by simply hanging up on prerecorded calls. However, self-help is no substitute for the statute's protections. Turning off ringers forces people into isolation. Screening is not available to people too poor to afford an answering machine and would clutter the machines of those who can afford them. Hanging up does not allow the called party to tell the caller not to call again and does not always disconnect the call.
 
 4. ALTERNATIVE CHANNELS OF COMMUNICATION
 
 46
 The utility statute leaves ample alternative channels free to the public to disseminate messages through the use of handbills, bill boards, magazines, newspapers, television, radio, telemarketing, and even ADADs introduced by a live operator.
 
 
 47
 Bland claims that no other means of advertising is remotely as effective as ADADs, that the utilities statute is destroying his business and forcing him to lay off his employees, and that the live operator requirement drives up the cost of using an ADAD from less than $2,000 to more than $50,000. Even if these claims are credited, the fact that "more people may be more easily and cheaply reached" by a particular method of speech is not the test. Kovacs, 336 U.S. at 88-89, 69 S.Ct. at 454-55.III. CONCLUSION
 
 
 48
 We affirm. The utilities statute is constitutional on its face and as applied. We uphold the dismissal of the action against the Attorney General, but on the basis of the plaintiffs' lack of standing.
 
 
 
 [1]
 The utilities statute, which exempts calls between parties with an existing relationship and calls from schools, nonprofit organizations, utilities, and public-safety officials, see infra, provides:
 Whenever telephone calls are placed through the use of an automatic dialing-announcing device, the device may be operated only after an unrecorded, natural voice announcement has been made to the person called by the person calling. The announcement shall do all of the following:
 (1) State the nature of the call and the name, address, and telephone number of the business or organization being represented, if any.
 (2) Inquire as to whether the person called consents to hear the prerecorded message of the person calling.
 
 
 [2]
 We omit its provisions as we do not review it on the merits
 
 
 [3]
 NATO is a nonprofit corporation whose members advertise their products or services by telephone
 
 
 [4]
 The Attorney General moved to dismiss under Rule 12(b)(6). However, he argued both jurisdictional bar and failure to state a claim. The former apparently is amenable to dismissal only under Rule 12(b)(1) in this circuit. See Gemtel Corp. v. Community Redevelopment Agency, 23 F.3d 1542, 1544 n. 1 (9th Cir.1994) (mootness and ripeness properly challenged under Rule 12(b)(1)); but see generally 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1360, at 435-37 (2d ed. 1990) (courts are not uniform in this view). The latter is properly brought under Rule 12(b)(6). The district judge stated "the claim that there is no justiciable case or controversy is not well taken. There is a case or a controversy sufficient to request declaratory relief." However, because the judge had found the utilities statute constitutional and concluded that the civil statute was substantially the same, he ruled that no claim could be stated against the Attorney General. He therefore dismissed the civil statute claim under Rule 12(b)(6)
 
 
 [5]
 We need not address the constitutionality of the civil statute in light of our decision that plaintiffs lack standing to sue the Attorney General
 
 
 [6]
 Although he mischaracterized his motion as a 12(b)(6) motion, the Attorney General advanced his argument on standing with supporting affidavits
 
 
 [7]
 The Attorney General argues that plaintiffs also lack standing because we cannot remedy plaintiffs' alleged injury: even if we strike down the civil statute and forbid the Attorney General from enforcing it, consumers can enforce it, Cal.Civ.Code §§ 1780-1784, and the California courts hold they are not bound by federal appeals court interpretations of the United States Constitution. People v. Bradley, 1 Cal.3d 80, 81 Cal.Rptr. 457, 460 P.2d 129, 132 (1969) (en banc); People v. Perez, 229 Cal.App.3d 302, 279 Cal.Rptr. 915, 919 (1991)
 We criticized a similar argument advanced in Yniguez v. Arizona, 939 F.2d 727 (9th Cir.1991), aff'd in part, rev'd in part sub nom. Yniguez v. Arizonans for Official English, 42 F.3d 1217 (9th Cir.1994), aff'd upon reh'g, 69 F.3d 920 (9th Cir.1995) (en banc). There, a party argued that the interests of two proposed Rule 24(a) intervenors were not practically impaired because they could relitigate the federal constitutional questions in the Arizona state courts. Id. at 735-36. The court voiced its "serious doubts as to the wisdom of this view," citing congressional intent, judicial economy, and the traditional right to a Supreme Court appeal when a federal circuit court strikes down a state law. Id. at 736-37. See Yniguez, 69 F.3d at 926 (favorably discussing the 1991 panel's intervention decision).
 Because the plaintiffs suffer no injury in fact, we need not address this issue.
 
 
 [8]
 The Attorney General has the power to do so, Cal.Bus. & Prof.Code §§ 17200 et seq.; the Attorney General sponsored the bill that became the civil statute, and the California legislature intended the Attorney General to enforce it
 
 
 [9]
 Both statutes in Project 80's exempted "requested or invited" solicitors and one of them (the Pocatello ordinance) exempted persons who solicit donations for charities or nonprofit organizations. Project 80's, 942 F.2d at 636-37
 
 
 [10]
 Plaintiffs suggest, for example, that munitions facilities are not exempted
 
 
 [11]
 Because we conclude that the protection of privacy is a sufficiently significant governmental interest to justify the statute, we need not address plaintiffs' arguments with respect to other rationales
 
 
 [12]
 Plaintiffs invoke Carey v. Brown, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (striking down residential picketing ban that exempted labor pickets), for the proposition that the utilities statute's exemptions undermine its privacy rationale. Carey is inapposite. While pickets disrupt privacy and union pickets disrupt residential privacy as much as pickets by other groups, ADAD calls' disruption of privacy are of a different magnitude. Moreover, the guiding principles in Carey were the Court's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," 447 U.S. at 462-63, 100 S.Ct. at 2291 (citations and quotations omitted), and the Court's disapproval of favoritism for speech by labor unions to the exclusion of others' protests on other subjects of public interest and importance
 
 
 [13]
 Although Van Bergen also held that the "efficient conduct of business operations" is a significant governmental interest justifying limits on free speech, 59 F.3d at 1554, we view this rationale with caution and skepticism. See Waters v. Churchill, --- U.S. ----, ----, 114 S.Ct. 1878, 1888, 128 L.Ed.2d 686 (1994) ("The government cannot restrict the speech of the public at large just in the name of efficiency.")