Dennis LYSAGHT, Michael Berardi and National Association of Telecomputer Operators, Plaintiffs

v.

STATE OF NEW JERSEY, Frederick P. Devesa, in his capacity as Acting Attorney General of the State of New Jersey, Defendants.

Civ. A. No. 93–4817.

United States District Court, D. New Jersey.

Nov. 16, 1993.

McManimon & Scotland, by Michael A. Lampert, Newark, NJ, for plaintiffs.

Attorney Gen. Div. of Law, by Ellen Schwartz, Newark, NJ, for defendants.

### OPINION

HAROLD A. ACKERMAN, District Judge:

This matter comes before the court upon the application of plaintiffs Dennis Lysaght, Michael Berardi, and the National Association of Telecomputer Operators for a preliminary injunction enjoining the State of New Jersey and the Acting Attorney General from enforcing Senate Bill No. 511.

For the following reasons, plaintiffs' application is granted.

## I. Standard for Preliminary Injunction

Rule 65 of the Federal Rules of Civil Procedure authorizes a district court to issue a preliminary injunction when the moving party demonstrates (1) a reasonable probability of success on the merits; and (2) that he or she will be irreparably injured by denial of such relief. In deciding whether to grant the injunction, the court must also consider (3) whether granting preliminary relief will result in even greater harm to the defendant; and (4) whether granting preliminary relief will be in the public interest. *See ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987); *SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1255 (3d Cir.1985); *In re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1137, 1143 (3d Cir.1982). The burden of proof is on the movant. *ECRI,* 809 F.2d at 226.

An evidentiary hearing, while often necessary, is not required. Rather, "[a] preliminary injunction may issue on the basis of affidavits and other written evidence, without a hearing, if the evidence submitted by both sides does not leave unresolved any relevant factual issue." *Williams v. Curtiss–Wright Corp.,* 681 F.2d 161, 163 (3d Cir.1982). As the Second Circuit has held, the purpose for an evidentiary hearing is "to ensure that relief follows only after consideration of all facts and arguments deemed important by the parties." *Drywall Tapers and Pointers of Greater New York, Local 1974 v. Operative Plasterers' and Cement Masons' Int'l Ass'n of United States and Canada,* 537 F.2d 669, 674 (2d Cir.1976).

In this case, the parties have stipulated that an evidentiary hearing is unnecessary. Thus, I will decide this matter based on the submitted record and the arguments presented to the court by counsel.

The following constitutes my findings of fact and conclusions of law pursuant to Rule 52(a).

## II. Findings of Fact

The plaintiffs in this matter are two individuals and a trade association of telecomputer operators. The individual plaintiffs are self-employed independent contractors who perform telemarketing services. In the course of their business, each of these plaintiffs utilize an automatic dialing announcing device ("ADAD") to solicit business.

An ADAD is one of two general types of telemarketing computers currently in use. An ADAD automatically dials a telephone number and plays a prerecorded or synthesized message if a person answers the telephone. The other type, called a predictive dialer, also automatically dials a telephone number. This type of machine, however, has the ability to transfer the call to a live person once the phone is answered.

Historically, ADADs have experienced several problems which have caused them to be unpopular with the general public. For example, some ADADs have been unable to differentiate a telephone answering machine from a live person, thus causing the ADAD to leave a long message on the answering machine. Many ADADs have also failed to recognize the "click" of the recipient hanging up the telephone, thus tying up the recipient's telephone line for a significant length of time. Plaintiffs have submitted evidence demonstrating that technological advances have largely eliminated these and other problems.

On December 20, 1991, President Bush signed the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 (the "TCPA"), into law. This legislation, inspired by the aforementioned problems and complaints received by the Federal Communications Commission, prohibits use of an artificial or prerecorded voice to deliver commercial messages without the prior express consent of the called party. Only one federal court has considered the constitutionality of the TCPA. After issuing a preliminary injunction, *Moser v. FCC,* 811 F.Supp. 541 (D.Or.1992), the District of Oregon held, on a motion for summary judgment, that the TCPA violates the First Amendment of the United States Constitution. *Moser v. FCC,* 826 F.Supp. 360 (D.Or.1993).

The overwhelming majority of states also regulate the use of automatic telephone dialing machines in some fashion. Only one statute, Minnesota's, has faced judicial review. In *State of Minnesota v. Casino Marketing Group, Inc.*, 491 N.W.2d 882 (Minn. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1648, 123 L.Ed.2d 269 (1993), the Minnesota Supreme Court held that Minnesota's statute, which is virtually identical to the TCPA, does not violate the First Amendment.

In August 1993, the New Jersey Legislature passed a statute which is similar to the TCPA and the Minnesota statute. Senate Bill 511, supplementing Chapter 17 of Title 48 (the "Act"), prohibits delivery of a prerecorded commercial advertisement, unless a live operator obtains the consent of the called party. The Act does not require consent for delivery of noncommercial messages. As a consequence, the Act prohibits the use of ADADs for delivery of commercial messages because ADADs are unable to obtain the consent of the call recipient before playing a recorded message. The Act provides in pertinent part:

> 2. A caller shall not use a telephone or telephone line to contact a subscriber to deliver a recorded message for the purpose of delivering commercial advertisement to the subscriber, unless the recorded message is introduced by an operator who shall obtain the subscriber's consent before playing the recorded message, or unless a prior or current business relationship exists between the caller and the subscriber.
>
> 3. The use of automated dialing, push button, or tone activated devices which operate sequentially or are otherwise unable to avoid contacting subscribers who have not consented to the playing of the recorded message as provided in section 2. of this act is prima facie evidence of an intention to violate this act.[1]

The Act provides for a penalty of not less than $300 and not more than $800.[2]

Plaintiffs now seek a preliminary injunction to enjoin enforcement of the Act during the pendency of this litigation. The plaintiffs make two arguments in challenging the Act. They argue that it violates the right to free speech protected by the First Amendment, as applied to New Jersey under the Fourteenth Amendment, and that it is preempted by the TCPA.

## III. Conclusions of Law

### A. Likelihood of Success on the Merits

■ I will address plaintiffs' First Amendment argument first.

### 1. Is the Act Content–Neutral?

It is well-settled that "government may impose reasonable restrictions on the time, place or manner of engaging in protected speech provided that they are adequately justified 'without reference to the content of the regulated speech.'" *Cincinnati v. Discovery Network, Inc.*, —— U.S. ——, ——, 113 S.Ct. 1505, 1516, 123 L.Ed.2d 99 (1993) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989)). The state asserts that the Act is content-neutral, and should therefore be analyzed under the standards applicable to restrictions on the time, place, or manner of engaging in free speech. Specifically, the state argues that on its face, the statute is a content-neutral regulation of the manner (artificial or prerecorded voice) and place (the home) of commercial speech, regardless of the content of the message. I disagree.

As in *Discovery Network*, the statute here explicitly distinguishes between commercial and noncommercial speech. In short, whether a particular prerecorded message is pro-

---

**1.** A "caller" is defined as "a person who attempts to contact or contacts a subscriber in this State by telephone or using a telephone line."

A "subscriber" is defined as "a person who has subscribed to telephone service from a telephone company regulated as a public utility ... or from a company offering mobile telephone service."

The Act does not define "commercial advertisement."

**2.** The Act was scheduled to go into effect on November 13, 1993. However, at oral argument held before this court on November 10, 1993, the state stipulated that it would refrain from prosecuting any violators of the Act until November 18, 1993.

hibited by the statute is determined by the content of the message. "Thus, by any commonsense understanding of the term, the ban in this case is 'content-based.'" *Discovery Network,* — U.S. at — – —, 113 S.Ct. at 1516–17 (city regulation that bans commercial handbills but not newspapers is content-based); *see also Moser,* 826 F.Supp. at 363 (finding that TCPA is content-based because it "distinguishes between messages on the basis of content (commercial versus noncommercial)").[3]

The statute therefore cannot be justified as a legitimate restriction on the time, place, or manner of engaging in protected speech. Because the Act restricts commercial speech, this court must utilize the analysis set forth in *Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), governing restrictions on commercial speech.[4] *See Moser,* 826 F.Supp. at 364.

**2. Does the Statute Satisfy the *Central Hudson* Test?**

*Central Hudson* sets forth a four-part test to analyze restrictions on commercial speech:

At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

447 U.S. at 566, 100 S.Ct. at 2351. This test provides commercial speech less protection

than that afforded other forms of constitutionally guaranteed expression. *Discovery Network,* — U.S. at —, 113 S.Ct. at 1513 (citing *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 455–56, 98 S.Ct. 1912, 1918–19, 56 L.Ed.2d 444 (1978)).

There is no allegation here that the speech prohibited by the Act is in any way unlawful or misleading. Therefore, the speech at issue is clearly entitled to First Amendment protection. Thus, in order to pass constitutional muster, the Act must (1) implement a substantial government interest; and (2) directly advance the governmental interest asserted, and not be more extensive than is necessary to serve that interest. *Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351.

**a. *Is the State's Interest Substantial?***

The parties do not dispute the state's substantial interest in promoting residential privacy. Indeed, the Supreme Court has repeatedly stressed that the government has an important interest "in protecting the well-being, tranquility, and privacy of the home." *Carey v. Brown,* 447 U.S. 455, 471, 100 S.Ct. 2286, 2296, 65 L.Ed.2d 263 (1980); *FCC v. Pacifica Foundation,* 438 U.S. 726, 748, 98 S.Ct. 3026, 3039–40, 57 L.Ed.2d 1073 (1978); *Pennsylvania Alliance For Jobs & Energy v. Council of Borough of Munhall,* 743 F.2d 182, 186 (3d Cir.1984). As the Supreme Court stated in *Frisby v. Schultz,* 487 U.S. 474, 484, 108 S.Ct. 2495, 2502, 101 L.Ed.2d 420 (1988), the government's interest in protecting the privacy of the home—the "last citadel of the tired, the weary, and the sick"—is "of the highest order."

Moreover, an "important aspect of residential privacy is the protection of the unwilling listener." *Frisby,* 487 U.S. at 484, 108 S.Ct.

---

**3.** Defendant relies on *Casino Marketing* in support of its position that the Act is content-neutral. However, that case was decided prior to *Discovery Network.*

**4.** Although the Act applies to "commercial advertisement," it does not define the term "commercial." Indeed, plaintiffs argue that the statute is void for vagueness on this ground. However, for purposes of the First Amendment analysis, both parties have apparently assumed that the prohibited speech in this case falls within the "core"

notion of free speech, that is, "speech which does 'no more than propose a commercial transaction,'" *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 385, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669 (1973)), and have applied the standards governing commercial speech set forth in *Central Hudson* and its progeny.

at 2502. Thus, the state's interest is particularly strong where, as here, it is protecting its citizens from speech that holds the listener captive in his or her own home. *See id.* at 484–85, 108 S.Ct. at 2502–03. The use of a telephone to deliver speech implicates this interest. As the Minnesota Supreme Court noted in *Casino Marketing*, the telephone is a "uniquely intrusive" means of disturbing residential privacy. The court continued:

> [T]he shrill and imperious ring of the telephone demands immediate attention. Unlike the unsolicited bulk mail advertisement found in the mail collected at the resident's leisure, the ring of the telephone mandates prompt response, interrupting a meal, a restful soak in the bathtub, even intruding on the intimacy of the bedroom.... Unlike the radio or the television, whose delivery of speech, either commercial or noncommercial, depends upon the listener's summons, the telephone summons the subscriber, depriving him or her of the ability to select the expression to which he or she will expose herself or himself.

491 N.W.2d at 888–89. New Jersey therefore has a substantial interest in protecting residential privacy from the intrusion of the telephone.

### b. Is There a Reasonable Fit Between the State's Interest and the Means Chosen to Achieve that Interest?

In *Board of Trustees of the State Univ. of New York v. Fox*, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), the Supreme Court clarified the last element of the test under *Central Hudson*. The Court rejected both the "least restrictive means" and "rational basis" tests as overly strict or permissive, 492 U.S. at 476–81, 109 S.Ct. at 3032–35, and held that restrictions on commercial speech must be "narrowly tailored to achieve the desired objective." *Id.* at 480, 109 S.Ct. at 3035. The *Fox* Court explained that this test requires a " 'fit between the legislature's ends and the means chosen to accomplish those ends,'—a fit that is not necessarily

perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served'...." *Id.* (quoting *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 341, 106 S.Ct. 2968, 2977, 92 L.Ed.2d 266 (1986); *In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982)); *see also Discovery Network*, — U.S. at ———, 113 S.Ct. at 1509–10 (there must be a "reasonable fit" between the legitimate state interest and the means chosen to serve that interest).[5] "Moreover, since the State bears the burden of justifying its restrictions," it has the burden of affirmatively establishing a reasonable fit between the legislature's ends and the means chosen to accomplish those ends. *Fox*, 492 U.S. at 480, 109 S.Ct. at 3034–35.

In *Discovery Network*, the City of Cincinnati, relying on a statute which prohibited "commercial handbills", revoked all permits for newsracks dispensing commercial magazines. The city argued that this action was a permissible method of furthering its interests in promoting safety and aesthetics.

The Court found that the benefit to be derived by the ban, *e.g.*, the removal of only 62 out of about 1,500–2,000 newsracks, was minimal. The Court accepted the city's argument that every decrease in the number of commercial newsracks would necessarily effect an increase in the safety and attractiveness of the city. Nonetheless, the Court held that this proposition alone was an insufficient justification for the city's restriction because it was premised on the proposition that commercial speech has low value. *Discovery Network*, — U.S. at ———, 113 S.Ct. at 1511. The Court held that the distinction between commercial and noncommercial speech bore no relationship to the city's asserted interests and that it was therefore an impermissible means of responding to the city's legitimate interest. *Id.* at ———, 113 S.Ct. at 1514. The Court stated:

> In the absence of some basis for distinguishing between "newspapers" and "com-

---

**5.** In *Discovery Network*, the Supreme Court essentially collapsed the last two requirements of *Central Hudson*, that is, that the regulation directly advance the government interest and that

it be narrowly tailored to achieve the desired objective, into the "reasonable fit" inquiry. — U.S. at ———, 113 S.Ct. at 1509–10.

mercial handbills" that is relevant to an interest asserted by the city, we are unwilling to recognize Cincinnati's bare assertion that the "low value" of commercial speech is a sufficient justification for its selective and categorical ban on newsracks dispensing "commercial handbills."

*Id.* at ——, 113 S.Ct. at 1516.

This court must therefore determine whether the distinctions drawn by the Act—between commercial telephone advertisements and noncommercial calls, and between prerecorded and live solicitations—are reasonably related to New Jersey's interest in protecting residential privacy. Although it is a close question, I find that the state has not at this time met its burden of establishing a reasonable fit between the Act and the legitimate privacy interests the New Jersey legislature seeks to promote.

i. Commercial/Noncommercial Distinction

The state argues that the statute here is "narrowly tailored" because it restricts only one type of commercial speech, that is, prerecorded messages. However, the relevant inquiry is whether this restriction is reasonably related to New Jersey's admittedly legitimate interest in residential privacy. I find that it is not. Put simply, both commercial and noncommercial prerecorded messages equally disrupt residential privacy. As the district court in Oregon found,

> There is no ... justification presented ... in the bald assertion that banning commercial solicitations but not nonprofit solicitations furthers the protection of residential tranquility. Both kinds of telemarketing calls trigger · the same ring of the telephone; both kinds of calls invade the home equally, and both risk interrupting the recipient's privacy equally.... [B]oth kinds of calls deprive the recipient of human interplay, both risk delivering a message

to an inappropriate party, and both risk fouling the means by which telephone subscribers can record callers' messages.

826 F.Supp. at 366. Thus, as in *Discovery Network,* the distinction between commercial and noncommercial prerecorded messages bears no relationship to the interest of protecting residents from unwarranted intrusions at home. The only arguable basis for such a distinction is the perceived "low value" of commercial speech. However, under *Discovery Network,* this is an impermissible justification for banning commercial messages. —— U.S. at ——, 113 S.Ct. at 1516.

The state argues that the prerecorded commercial solicitations at issue far outnumber noncommercial messages, thereby distinguishing *Discovery Network.* The state, however, has presented no proof of this contention. Rather, it relies on the fact that *complaints* regarding commercial messages generally outnumber complaints regarding noncommercial messages in the United States.[6] However, the fact that there are more complaints with respect to a particular type of call does not establish that that type of call is made with greater frequency. In contrast, the affidavit of Carl R. Kolker, dated February 18, 1993,[7] submitted by the plaintiffs, indicates that prerecorded messages make up less than three percent of all telemarketing calls received by Americans. Accordingly, the number of prerecorded commercial messages, the only type of speech banned by the Act, make up an even smaller percentage of all telemarketing calls. The state did not submit any evidence contradicting this data.

Moreover, the fact that there are a greater number of complaints relating to commercial prerecorded messages does not justify distinguishing commercial from noncommercial messages. In *Bolger v. Youngs Drug Prod-*

---

**6.** Specifically, the state relies on information compiled by the Minnesota Attorney General's Office, *see Casino Marketing,* No. C6–90–1244, slip op. at 1 (2d Jud.Dist. Aug 30, 1993), as well as a Report of the House Commission on Energy and Commerce, *see* H.R.Rep. No. 102–317, 102d Cong., 1st Sess. 16 (1991). However, there is no evidence that the New Jersey Legislature ever considered this information in passing the statute. Nor has any evidence been submitted that

the Legislature considered any data at all relating to complaints made by New Jersey residents or the number of telemarketing calls received in New Jersey.

**7.** Mr. Kolker is the President of Kolker Systems, Inc., a manufacturer of automatic dialing devices, and a member of the National Association of Telecomputer Operators.

**652**

*ucts Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), the Supreme Court rejected the government's reliance on its interest in protecting the public from "offensive" speech,[8] and specifically declined "to recognize a distinction between commercial and noncommercial speech that would render this interest a sufficient justification for a prohibition of commercial speech." 463 U.S. at 71–72, 103 S.Ct. at 2882–2883 (*citing Carey v. Population Services, Int'l*, 431 U.S. 678, 701 n. 28, 97 S.Ct. 2010, 2025 n. 28, 52 L.Ed.2d 675 (1977)). Thus, the fact that commercial speech is perceived as more "offensive" or "annoying" and may thereby generate a larger number of complaints is not by itself a legitimate basis for prohibiting that type of speech. This would run counter to the holding of *Discovery Network* that the "low value" of commercial speech is an insufficient justification for banning such speech. —— U.S. at ——, 113 S.Ct. at 1516.

The state also argues that the statute restricts only one type of commercial speech, that is, prerecorded messages, while permitting other forms of commercial speech. However, in *Discovery Network*, the Court rejected the argument that the city ordinance at issue was valid because it only denied the speaker one method of communication and did not interfere with alternative means of access to the audience. —— U.S. at ——, 113 S.Ct. at 1515 (citing *Bolger*, 463 U.S. at 79–80, 103 S.Ct. at 2887–2888).

Finally, the state cites *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) and *Posadas de Puerto Rico Ass'n v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986) in support of its position. However, these cases, which dealt with the issue of underinclusiveness, do not dictate a different result in this case. *See Moser*, 826 F.Supp. at 367. In *Metromedia*, the Court held a city ordinance, which banned outdoor "off-site" advertising billboards, but permitted "onsite" advertising signs identifying the owner of the premises and the goods sold or manufactured on the site, to be a permissible restriction on commercial speech. 453 U.S. at 494, 101 S.Ct. at 2885–86. However, as the Supreme Court in *Discovery Network* observed in distinguishing *Metromedia*, "[u]nlike this case, which involves discrimination between commercial and noncommercial speech, the 'off-site-onsite' distinction involved disparate treatment of two types of commercial speech. Only the onsite signs served both the commercial and public interest in guiding potential visitors to their intended destinations; moreover, the plurality concluded that a 'city may believe that offsite advertising, with its periodically changing content, presents a more acute problem than does onsite advertising.'" *Discovery Network*, —— U.S. at ——, n. 20, 113 S.Ct. at 1514 n. 20 (quoting *Metromedia*, 453 U.S. at 511–12, 101 S.Ct. at 2894–95). *Metromedia* does not stand for the proposition that government can "*distinguish* between commercial and noncommercial [speech] that cause the same esthetic and safety concerns." *Id.*

Similarly, the statute in *Posadas* distinguished between different types of commercial speech. Specifically, the statute in *Posadas* prohibited the advertising of casino gambling, but did not prohibit advertising with respect to other types of gambling, such as horse racing, cockfighting and lotteries. The Court held that such a distinction was legitimate because the restriction directly advanced the legislature's interest in reducing the demand for games of chance. 478 U.S. at 342, 106 S.Ct. at 2977. The Puerto Rican Legislature believed that the risks associated with casino gambling were significantly greater that those associated with types of gambling that were traditionally part of the Puerto Rican culture. *Id.* at 343, 106 S.Ct. at 2977–78.[9]

8. The statute involved in *Bolger* prohibited unsolicited advertisements relating to contraceptives. 463 U.S. at 61, 103 S.Ct. at 2877.

9. The court notes that the Minnesota Supreme Court has upheld a statute similar to that at issue in this case. *See Casino Marketing*, 491 N.W.2d 882. However, that case was decided prior to the Supreme Court's decision in *Discovery Network*. In fact, in *Casino Marketing*, the court relied in part on the perceived greater value of charitable contributions as contrasted with profit generated through commercial messages. This type of justification, however, that is, assigning a greater value to noncommercial speech than commercial speech, has been undermined by *Discovery Network*.

## ii. Recorded/Live Commercial Distinction

The Act also distinguishes between prerecorded commercial speech and nonrecorded commercial speech or recorded commercial speech introduced by an operator. The state does not directly address this distinction. In any event, I agree with the *Moser* court that this distinction does not advance New Jersey's interest in protecting the privacy of the home. *See* 826 F.Supp. at 366. As noted above, evidence submitted to this court by the plaintiffs indicates that only three percent of all telemarketing calls consists of prerecorded messages. However, all telemarketing calls, whether nonrecorded, introduced by a live operator, or prerecorded, threaten the privacy of the home. *See id.* at 367. In short, the distinction between live and prerecorded messages bears little relationship to the interests asserted by New Jersey. As the dissenting judge in *Casino Marketing* observed,

> the privacy interest being advanced is the interest in being free of interruptions from "the shrill and imperious ring of the telephone." But the live operator requirements advance that interest only incidentally, if at all. Once the person being called picks up the telephone, the interruption of privacy already has occurred. At that point, from a privacy perspective, it makes no difference whether the caller is a person or a machine. The damage to privacy is done, and the solution is the same in either situation: hang up the telephone.

491 N.W.2d at 892 (Tomljanovich, J., concurring in part and dissenting in part). In fact, Justice Tomljanovich observed that prerecorded solicitations may even be less intrusive than live solicitations for the reason that it is probably easier to hang up on a machine than on a live operator. *Id.* I find this reasoning persuasive. Finally, there appears to be no dispute that some of the earlier technical problems with prerecorded messages, which prompted passage of the TCPA, *see* S.Rep. No. 102–178, 102d Cong., 2d Sess. (1991), *reprinted in* 1991 U.S.C.C.A.N. 1968, 1972, have been alleviated through technological advances. *See* Affidavit of Carl R. Kolker, dated November 7, 1992. Indeed, the state does not assert these problems as a justification for distinguishing between prerecorded and live messages. I therefore conclude that the state has not demonstrated a reasonable fit between the statute and the interest in protecting persons in their homes.

Accordingly, at this juncture of the case and based on the record before me, it appears that the Act constitutes an impermissible restriction of commercial speech in contravention of the dictates of the First Amendment. That is not to say that upon full trial of this case and consideration of permanent injunctive relief, the state will not be able to establish the necessary reasonable fit between the Act and the interests it seeks to promote. At this stage of the litigation, however, it has not. I, therefore, find that plaintiffs have established a likelihood of success on the merits.

In light of this conclusion, I need not address plaintiffs' remaining arguments that the statute is void for vagueness and that the statute is preempted by the TCPA.

## B. Irreparable Harm

It is well-established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976); *School District of Lancaster Manheim Township School District v. Lake Asbestos of Quebec, Ltd. (In re School Asbestos Litigation),* 842 F.2d 671, 679 (3d Cir.1988). In *Hohe v. Casey,* 868 F.2d 69 (3d Cir.), *cert. denied,* 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989), the Third Circuit explained, however, that "the assertion of First Amendment rights does not automatically require a finding of irreparable injury." *Id.* at 72–73. The court explained:

> Rather the plaintiffs must show "a chilling effect on free expression." It is "purposeful unconstitutional [government] suppression of speech [which] constitutes irreparable harm for preliminary injunction purposes." Accordingly, it is the "direct penalization, as opposed to incidental inhibition, of First Amendment rights [which] constitutes irreparable injury."

*Id.* at 73 (citations omitted). Here, plaintiffs have demonstrated a chilling effect resulting

from threatened prosecution of plaintiffs pursuant to the Act. *See Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); *see also Citizens United for Free Speech II v. Long Beach Township Bd. of Comm'rs,* 802 F.Supp. 1223, 1237–38 (D.N.J. 1992) (distinguishing *Hohe* ). In other words, this case involves "direct penalization" of plaintiffs' First Amendment rights, rather than an "incidental inhibition." I therefore find that under the circumstances of this case, plaintiffs would suffer irreparable harm if the preliminary injunction were not issued. *See Moser,* 811 F.Supp. 541, 546 (D.Or.1992).

C. Balancing of Public and Private Interests

The final two elements of the preliminary injunction analysis, the balance of harms and the public interest, also support issuance of a preliminary injunction. The only harm that would result from a preliminary injunction is that citizens of New Jersey would continue to receive prerecorded commercial telephone advertisements during the pendency of the litigation. As noted above, the ban would only eliminate less than three percent of all telemarketing calls. Therefore, the hardship to the state and the public interest is a delay in eliminating one out of every thirty phone calls. *See Moser,* 811 F.Supp. at 545. I therefore cannot conclude that this hardship outweighs the harm that would be imposed on the plaintiffs. "In addition, in cases involving First Amendment speech rights, consideration of the public interest tends to weigh in favor of enjoining undue restrictions on expression." *Citizens United for Free Speech,* 802 F.Supp. at 1238. I therefore conclude that the balance of harms and the public interest strongly weigh in favor of permitting the free exercise of First Amendment rights in this case.

Conclusion

For the foregoing reasons, the plaintiffs' application for preliminary injunctive relief is granted.

## ORDER

This matter having come before the court on the motion of plaintiffs for a preliminary injunction enjoining the defendants from enforcing Senate Bill No. 511; and this court having fully considered the submitted briefs and the record before it, including the oral arguments made on November 10, 1993; and for the reasons expressed in an opinion issued this same day; and for good cause shown;

It is on this 16th day of November, 1993

ORDERED that plaintiffs' motion for a preliminary injunction is granted; and it is further

ORDERED that plaintiffs shall ·post a bond pursuant to Rule 65(c) of the Federal Rules of Civil Procedure in the amount of $15,000.