**ATLANTIC COAST DEMOLITION & RECYCLING, INC., et al., Plaintiffs,**

v.

**BOARD OF CHOSEN FREEHOLDERS OF ATLANTIC COUNTY, et al., Defendants.**

Civ. A. Nos. 93–2669 (JEI), 94–3244 (JEI).

United States District Court, D. New Jersey.

Nov. 28, 1995.

Mesirov Gelman Jaffe Cramer & Jamieson by Mark R. Rosen, Haddonfield, NJ, for plaintiff Atlantic Coast Demolition & Recycling, Inc.

Steptoe & Johnson by William T. Hassler, Washington, DC, for plaintiffs C & A Carbone, National Solid Waste Management Association, Waste Management Association of New Jersey.

James J. Ciancia, Acting Attorney General of New Jersey by Gail M. Lambert, Deputy Attorney General, Stefanie A. Brand, Deputy Attorney General, Department of Law and Public Safety, Division of Law, Newark, NJ, for defendant Robert Shinn, New Jersey Department of Environmental Protection.

Murshell J. Bland, County Counsel by Barbara H. Parker, Assistant County Counsel, County of Bergen, Hackensack, NJ, for defendants Bergen County Department of

Health Services, William P. Schuber and Mark Guarino.

DeCotiis, Fitzpatrick & Gluck by J.S. Lee Cohen, Hackensack, NJ, for Intervenor–Defendants Hudson County Improvement Authority, Mercer County Improvement Authority, Essex County Utilities Authority, and Passaic County Utilities Authority.

Wolff & Samson, P.C. by David Samson, Roseland, NJ, for Intervenor–Defendant Camden County Energy Recovery Associates, L.P.

Sinisi, Van Dam & Sproviero by Stephen P. Sinisi, Paramus, NJ, for defendant Bergen County Utilities Authority.

Higgins, Slachetka & Long by Joseph J. Slachetka, Laurel Springs, NJ, for defendant Cape May County Municipal Utilities Authority.

IRENAS, District Judge:

The Court finds that the defendants have not established that a preliminary injunction would cause irreparable harm either to themselves or to the public if an alternative regulatory scheme is implemented. A preliminary injunction will be granted to restrain enforcement of the current flow control regulations of construction and demolition ("C & D") materials in accordance with the alternative regulatory plan ("Plan") submitted by the New Jersey Department of Environmental Protection ("NJDEP" or "the State") on August 8, 1995. The Court interprets the Plan as eliminating flow control of all mixed loads of C & D waste so that in-state interests are not unfairly injured, accepts the Plan as being in compliance with the Court's Opinion and Order of June 9, 1995, and grants the State sixty days to implement the Plan with appropriate regulatory action. If no regulations are in place at that time, haulers of C & D waste will be permitted to (i) take mixed loads of C & D waste to any

properly licensed recycling facility, whether in New Jersey or elsewhere, and (ii) dispose of the unrecycled residue at any lawfully operated site, whether in New Jersey or elsewhere.

## I. PROCEDURAL HISTORY [1]

On June 6, 1995, this Court held a hearing in regard to plaintiffs' request for a preliminary injunction against flow control of construction and demolition waste in New Jersey. In its Order of June 9, 1995, the Court granted an injunction conditional upon further submissions by the defendants regarding potential alternatives to the current regulations and the possibility of serious irreparable harm to the defendants or the public because of the injunction.

The State submitted its Plan on August 8, 1995. Co-defendants Camden County Energy Recovery Associates ("CCERA"), Bergen County Utilities Authority ("BCUA"),[2] and Cape May County Municipal Utilities Authority ("CMCMUA") responded to the Plan on September 8, 1995, as did defendants/intervenors Essex County Utilities Authority ("ECUA"), Hudson Improvement Authority ("HCIA"), Mercer County Improvement Authority ("MCIA"), and the Passaic County Utilities Authority ("PCUA"). Responses to all of these submissions were filed on October 13, 1995, by plaintiff Atlantic Coast Demolition & Recycling, Inc. ("Atlantic Coast") and the Carbone plaintiffs.[3] The State and the co-defendants replied to these responses on October 20, 1995.

The plaintiffs filed a motion for summary judgment on October 27, 1995, requesting that defendants be forestalled from presenting any evidence at the trial on the merits of the need for revenue generation as a justification for flow control. This motion was denied after oral argument on November 6,

---

1. For the complete procedural history and finding of facts, refer to this Court's Opinion of June 9, 1995, conditionally granting a preliminary injunction, and to its oral Opinion rendered September 8, 1993.

2. Bergen County, Bergen County Department of Health Service, William P. Schwar, and Mark Guarino joined in this response.

3. The Carbone plaintiffs consist of C & A Carbone, the National Solid Waste Management Association, and the Waste Management Association of New Jersey.

1995. Oral argument regarding the preliminary injunction was also heard on November 6, 1995.

## II. STATEMENT OF FACTS

### A. Flow Control of C & D Waste—The Current Regulatory Scheme

Over the last twenty-five years, New Jersey has developed a regulatory structure under which it monitors the flow of waste produced in the state. Twenty-two solid waste management districts were established in 1991, *N.J.S.A.* 13:1E–19, and each is responsible for developing and implementing a waste plan to treat and accommodate all solid waste generated within its boundaries. A key aspect of the district plans is waste flow control, through which the districts direct haulers to dispose of waste in designated facilities. If a district does not have sufficient capacity to dispose of or recycle its own waste, it can make arrangements with in-state or out-of-state facilities to handle all or a portion of the waste. New Jersey divides its waste into categories, one of which is Type 13 bulky materials. *N.J.A.C.* 7:26–2.13(g)(1)(iii) (1995). Approximately 64.3% of Type 13 bulky waste is C & D waste from the construction, demolition, or renovation of residential and commercial buildings.[4] *Plan,* at 11. C & D waste makes up about 23% of all solid waste material generated annually in New Jersey and 12% of the total waste disposed in the state. *Plan,* at 15.

There are essentially two categories of C & D waste: recyclables and non-recyclables. If a load of C & D waste has been sorted at the site of its creation, such that the load is composed only of C & D recyclables, it is not subject to waste flow control and it can be transported to any in-state or out-of-state facility. *N.J.A.C.* 7:26–1.1(a)(1) (1995).

Non-recyclable C & D waste must be disposed of at a district's designated facility in accordance with flow control regulations. If a C & D load has not been source separated, it is a mixed load[5] that contains both recyclable and non-recyclable waste. There are two types of C & D mixed loads: 1) those composed of waste from only one solid waste management district; and 2) those composed of waste from more than one district. These latter mixed loads of nonhazardous solid waste (Types 10, 13, 23, 25 and 27), which the Court will refer to as multi-district loads, are subject to additional state regulations. *N.J.A.C.* 7:26–2B.9 and 26–6.9 (1995); *Sondermeyer Deposition,* at 162. Multi-district mixed loads are delivered to in-state materials recovery facilities ("MRF"s) or transfer stations for sorting of recyclables. The remaining waste is returned to an appropriate facility for disposal in accordance with state regulations.

There is some dispute as to what type of mixed load can be taken out of the state for processing of recyclables. The Pereira Memorandum of June 7, 1983, promulgated by an employee of NJDEP, was interpreted by the State as permitting both categories of mixed loads to be taken out of New Jersey for sorting of recyclables as long as the waste remaining after the sorting, an equivalent amount of waste, or an appropriate fee was returned to the district of origin. Some districts, however, interpreted the Pereira

---

4. NJDEP estimates that the C & D component of Type 13 bulky waste includes: treated wood, untreated wood scrap, tree stumps, tree parts and branches (25–34%); concrete asphalt, bricks, blocks and other masonry (24%); wallboard (15%); roofing materials (10%); corrugated cardboard and miscellaneous paper (8–18%); ferrous metal pipes and non-ferrous metal (7%); building insulation (4%); plastic scrap (2%); dirt (2%); carpets and padding (2%); glass (1%); and other miscellaneous materials in negligible amounts. *Plan,* at 5.

5. There appear to be two uses of "mixed" when referring to loads of waste. Prior to the November 6, 1995, proceedings, "mixed" was used in this litigation to refer to loads composed of both recyclable and non-recyclable materials. This was the definition of "mixed" used by the Third Circuit in its 1995 opinion. *Atlantic Coast Demo. v. Bd. of Chosen Freeholders,* 48 F.3d 701, 707 (3d Cir.1995).

When the regulations memorializing the Pereira Policy were discussed in the New Jersey Register, "mixed" was used to refer to loads containing C & D waste that originated in more than one district. 24 N.J.R. 3286(c), 3287 (Sept. 21, 1992); 25 N.J.R. 4763(a), 4763 (Oct. 18, 1993). Gary Sondermeyer, an official at NJDEP, also employed this definition when discussing mixed loads in his recent deposition. *Sondermeyer Deposition,* at 11, 161.

Policy as requiring that the facility doing the recycling be included in a district plan.[6] In 1992, regulations were promulgated to codify the Pereira Policy. *N.J.A.C.* 7:26–2B.9 and 26–6.9 (1995). Gary Sondermeyer, Assistant Director of the Division of Solid and Hazardous Waste of NJDEP, and a primary author of the Plan, now interprets these regulations as not authorizing out-of-state sorting of multi-district mixed loads. *Sondermeyer Deposition*, at 25–26. It appears to the Court that the regulations memorializing the Pereira Policy do not prohibit out-of-state processing of mixed loads. The New Jersey Administrative Code states:

> **Transporting solid waste between solid waste districts and out-of-State**
>
> (a) Notwithstanding the designation of specific disposal facilities for ultimate disposal of certain waste streams, it shall not be a violation of N.J.A.C. 7:26–6 or any franchise approvals issued pursuant to N.J.S.A. 48:13A–5 [f]or solid waste generated in a district to be transported out of that district or for out-of-district waste to enter a solid waste district for the processing or recovery of materials provided the requirements of N.J.A.C. 7:26–2.11, 2.13, and 2B.9 are met.
>
> (b) Facilities designated by solid waste districts for the ultimate in-State disposal of solid waste shall accept out-of-district waste from transfer stations or materials recovery facilities provided the requirements of N.J.A.C. 7:26–2.13 are met.

*N.J.A.C.* 7:26–6.9 (1995). Regardless of how the current regulations are interpreted, plaintiffs seek, and will be granted, the right to take all mixed loads of C & D waste, including multi-district mixed loads, to any in-state or out-of-state recycling facility, and to dispose of the unrecyclable residue without regard to existing flow control regulations.

## B. The State's Plan

Although the State submitted its Plan as required by the Court's Order of June 9, 1995, it continues to maintain, and the co-defendants concur, that the current flow control system is the only means of regulating the waste flow in New Jersey and that even the limited modification embodied in the Plan will seriously harm the public. *Plan*, at 1. Under the Plan, a transporter of mixed loads of C & D waste wishing to take the loads to out-of-state facilities would first go to the same facility to which it is directed for disposal of non-recyclables or transfer of loads under the current waste flow scheme. Rather than dump its load, the hauler would weigh in at a monitoring point,[7] and the facility would have the option to untarp the truck and examine the load, or to require the hauler to dump the load for a more thorough inspection. *Plan*, at 17; *Sondermeyer Deposition*, at 28. The hauler would not be charged a tipping fee or any kind of user fee, but would be required to submit one or more forms indicating the type of waste, the municipality from which it was generated, and the ultimate disposal location which the transporter intends to use. *Plan*, at 17. The forms would be used for record-keeping purposes and to ensure that transporters use the facility they designate. *Plan*, at 17. Reporting at transfer facilities has been found to be more accurate than information reported from haulers. *Sondermeyer Deposition*, at 141.

The State expects that the optional inspection would largely deter illegal diversion of the unaffected 88% of the State's waste. *Sondermeyer Deposition*, at 28. The Cape May County Municipal Utilities Authority suggests that at least 15% of waste delivery

6. For a discussion of the various interpretations of the Pereira Policy, refer to the Court's Oral Opinion of September 8, 1993, at 38–39, in this case.

7. In its Response to the Plan, the Cape May County Municipal Utilities Authority suggests that re-weighing of vehicles after tipping should be performed at the receiving facility, and the owner of the delivery vehicle should be required to insure that the empty weight is recorded and submitted in a timely fashion to the originating solid waste district. *CMCMUA Response to Plan*, at 16. CMCMUA later presented the Unsworn Declaration of George Marinakis, P.E., to suggest that the weight of waste loads could be determined using tare weights of vehicles. The State has not specified how weighing will occur, and the Court leaves this decision to the State's discretion, as discussed *infra*.

vehicles should be subjected to a random thorough inspection by requiring that the full load be deposited in a designated area, and that any load suspected of containing unauthorized waste could be subjected to a similar search. *CMCMUA Response to the Plan,* at 16.

## C. Alternative Plans

The plaintiffs have submitted testimony describing other alternatives to waste flow control that could be used by a state or have been used by other local governments throughout the country. The Affidavit of Bruce J. Parker addresses plans employed by cities in Minnesota and Pennsylvania, while his deposition details nondiscriminatory proposals that could be employed by New Jersey. *See, e.g., Parker Deposition,* at 64–65. Attached to the Parker Affidavit is the Statement of Michael Shapiro, Director, Office of Solid Waste, U.S. Environmental Protection Agency, in which Mr. Shapiro concludes that flow control is not required to meet environmental and waste management goals such as those of concern to New Jersey. Also attached is the Supplemental Certification of Philip Weinberg discussing Massachusetts' waste regulation scheme. The Court's role at this point is not to evaluate these alternative plans which may be available to the State, but to decide if the Plan promulgated by the State is an acceptable nondiscriminatory alternative to the current flow control of C & D waste.

## D. Financing the State Mandated Plan

### 1. Cross–Subsidization of Tipping Fees

While the county defendants generally endorse the State's Plan as the most workable alternative to flow control, they disagree on how to finance it. The State suggests that the best financing alternative is to cross-subsidize the loss in C & D revenues caused by a decreased input of such waste by raising the tipping fee for other types of waste. *Plan,* at 15–16. It proposes that the counties submit petitions to establish tariff adjustments so that sufficient revenues are maintained to compensate for any losses of C & D debris. *Id.* Some counties may choose to minimize the subsidy by cutting operating expenses while others decide to make up the revenues in the rates of some but not other types of waste. The State describes two other options in its Plan (Options II and III), but does not recommend either one.

Camden County Energy Recovery Associates objects to this cross-subsidization and argues that it will place an unfair, disproportionate burden on generators of waste that can be processed and may result in a greater decrease in waste brought to their facility as the costs increase and haulers seek alternative disposal sites. *CCERA Response to Plan,* at 4. CCERA also objects to the State's insistence on maintaining the utility system for solid waste disposal facilities and the requirement that the State approve all tariff changes. *Id.* at 5. With the increased need for competitive pricing that will accompany the elimination of C & D flow control, CCERA argues that it is infeasible to require State approval for disposal rates when that approval, at best, takes five months from submission of a proposal. *Id.* Essex County Utilities Authority, Hudson County Improvement Authority, Mercer County Improvement Authority, and the Passaic County Utilities (the "County Authorities") likewise contend that the traditional rate-making procedures are too cumbersome to permit counties to respond to market fluctuations. *County Authorities' Response to Plan,* at 3.

### 2. Other Financing Options

The co-defendants express concern that cross-subsidization is not the proper financing tool for the Plan. Instead, they suggest a variety of ways to compute a service fee that could be imposed on haulers of C & D waste. The County Authorities propose that each County/Solid Waste Management District calculate and impose a System Benefit Charge ("SBC") on each ton of waste generated in the County/District. *County Authorities' Response to Plan,* at 5. The SBC would represent the allocable portion of the associated fixed costs of the relevant waste disposal system. These costs would include, but not be limited to, debt service, recycling costs, operating and administrative expenses, host community payments, and State imposed taxes. The SBC would be collected

from haulers as they weighed in waste-laden vehicles at district-designated scale houses. Haulers would in turn build an established SBC fee into the rates charged to customers. A separate tipping fee would be charged to those that deposit C & D waste in-state. The County Authorities admit that this plan would likely require legislative amendment and rule-making.

The Bergen County Utilities Authority (BCUA) proposes the development and implementation of a bifurcated rate structure comprising:

a) a solid waste tariff design for the diverse solid waste types subject to transportation and disposal services provided by BCUA through its transfer station system;

b) a BCUA-implemented "user charge," enacted in accordance with N.J.S.A. 40:14B–22.1, to allocate the non-transportation and disposal components of BCUA's integrated Solid Waste System among the "users" who have, and continue to benefit from such programs and services—Bergen County's residents.

*BCUA Response to Plan,* at 9. To develop an equitable "user charge," BCUA would use statistical data from local building permit applications to allocate a fee on a municipality-by-municipality basis, and an assessed city could in turn determine how best to recoup the assessment, e.g., through incorporation in its tax base, or through establishment of a surcharge on the issuance of building permits. *Id.* at 11.

The Cape May County Municipal Utilities Authority proposes that the lost revenues be recouped through the assessment of a county construction and demolition fee on all C & D waste delivered to its facilities either for the purpose of processing and disposal or for the purpose of inspection and weighing prior to out-of-state disposal. *CMCMUA Response to Plan,* at 17–18. The assessment would be based on the fixed cost associated with providing the services and the capacity for acceptance and disposal of in-district generated C & D waste. Companies that actually deposited their waste in-district would be charged an additional fee. CMCMUA contends that this would be more equitable than an increase in the county tax rate, which would unfairly assess charges to residential users, including those who only seasonally occupy their property.

## III. DISCUSSION

### A. Harm to the Public and to Defendants

 The State has described the harms that may result to the public and the defendants if a preliminary injunction is granted. *Plan,* Section III. These harms, further elaborated upon by the co-defendants, include the impact on revenues to fund the regulatory scheme and the debt burden, environmental impacts, enforcement of waste flow regulations covering all types of waste in New Jersey, impact to existing recycling programs, and impact on solid waste planning. The Court must balance the harms to plaintiffs against those likely to befall the defendants or the public if an injunction is granted and the Plan implemented. Given that only a small portion of New Jersey's waste is at issue, the harms discussed below can be adequately addressed by the State's Plan.

#### 1. Impact on Revenues and Debt Burden

In its Plan, the State discusses public debt considerations, local budgetary restraints, county waste flow loss and the impact on revenue, and tariff equity concerns. *Plan,* at 44–56. The primary public harm that will result from the granting of a preliminary injunction appears to be the loss of revenues from C & D waste disposal and the threat to debt burdens undertaken in financing the facilities needed in the waste flow regulatory scheme.

Construction and demolition waste constitutes 12% of all waste disposed of in New Jersey. *Id.,* at 14. If its flow is no longer controlled by state regulation, the amount of C & D waste disposed of or recycled in New Jersey will likely decrease, but the decrease will not equal the total of all C & D waste. More likely only a portion of C & D waste will be transported out-of-state. The actual percentage lost and the actual impact on revenue will depend on what pricing adjustments can or will be made by New Jersey

facilities to meet out-of-state competition. In fact, some in-state facilities may see an increase in revenues because their tipping fees for C & D waste are competitive with the fees charged at out-of-state facilities. *Sondermeyer Deposition,* at 49, 56–57.

By their very nature, state laws and regulations which violate the Commerce Clause impact the economic well-being of public or private entities, and their elimination has a negative financial impact on someone. There are always winners and losers when economic relationships are forcibly altered. To deny a preliminary injunction solely on the basis that it causes economic harm to the previously benefitted party might leave the Court unable to vindicate a constitutional right.

Any revenue shortfall from the decreased disposal of C & D waste can be recovered through other means. At the very least, it appears that waste management districts can change the rates charged for tipping C & D waste to make this type of in-state disposal more competitive so fewer haulers choose to transport C & D waste out of New Jersey. The districts can also change the rates charged for tipping other types of waste to increase their revenues. The possible loss of revenue can be adequately addressed in connection with the implementation of the Plan and does not constitute the type of harm which would preclude the Court's enforcement of a preliminary injunction against flow control of C & D waste transported out of New Jersey. In short, while the Court finds that granting a preliminary injunction dismantling the entire waste flow scheme would wreak havoc in New Jersey and cause substantial public and private harm, the cessation of flow control of C & D mixed loads will not cause undue harm to the defendants or the public.

## 2. Environmental Impacts

The State argues that the implementation of the Plan raises a number of environmental concerns, including: (i) loss of control of mandatory truck access routes to and from transfer and disposal facilities; (ii) potential for significant increases in traffic along New Jersey roads en route to more distant in-state disposal facilities (up to 575 truck trips

daily over further distances); and (iii) potential increases in illegal disposal of waste. *Plan,* at 20.

The Carbone plaintiffs respond that little weight should be given to the State's arguments about truck routes, as many trucks already take waste out-of-state—these trucks likely will follow their established routes, and trucks travelling out for the first time can follow in their path. *Carbone Response to Plan,* at 13. In addition, the Carbone plaintiffs point out that New Jersey currently has no regulations governing the routes that must be taken by trucks hauling waste across the state. *Id.* at 14. Atlantic Coast details the State's practices regulating the transportation of waste and argues that the State generally has not demonstrated much concern for truck routes or volume. *Atlantic Coast Response to Plan,* at 14–17.

The Certification of Gary Sondermeyer, dated October 23, 1995, describes the ways in which truck routes in the State are monitored and explains that the State does not itself regulate these routes in most cases, but rather, leaves this task to the counties. In his deposition, Sondermeyer, Assistant Director of the Division of Solid and Hazardous Waste of NJDEP, and a primary author of the Plan, emphasizes that the State is concerned about the unpredictability that may result if C & D waste is permitted to travel anywhere within the state and the inability of facilities to plan for the number of trucks that will arrive on any given day. *Sondermeyer Deposition,* at 37.

Adoption of the Plan does not increase the total volume of waste transported in New Jersey. *Id.* at 42. The State's estimate of 575 truck trips each day equals the number of trips occurring under the current system with established truck routes. *Id.* at 39. One-third of C & D waste currently is disposed of out-of-state. *Id.* at 43–44. While these out-of-state patterns may change in some parts of New Jersey, the existing degree of out-of-state traffic suggests that the Plan's impact on traffic flow will not be as significant as claimed by the State.

Truck routes for transportation of waste intra-county to transfer stations or MRFs

already exist, and there is no apparent reason that these routes would not be applicable to mixed loads reporting for initial inspection and weighing as provided in the Plan. Nor is there any reason that the State or individual districts cannot adopt new mandatory truck routes for waste transporters using the State's thoroughfares, so long as these regulations do not discriminate against interstate commerce and are otherwise in conformity with applicable law.

### 3. Enforcement Concerns

The State expresses fear that permitting C & D waste to move in an open market with no ability for monitoring and surveillance will make overall waste flow enforcement for the balance of the waste stream exceedingly difficult. *Plan*, at 26–29; *Brubaker Deposition*, at 14. While the totally unrestrained interstate flow of waste might create significant enforcement problems, the Plan's provision for weighing and inspecting mixed loads transported out-of-state should substantially alleviate these concerns.

The Court is somewhat befuddled by suggestions that its Opinion and Order of June 9, 1995, has already caused a noticeable decrease in the amount of C & D waste deposited in-state. In his direct testimony, Richard Scott Brubaker, Chief of the Bureau of Compliance and Enforcement, Division of Enforcement Field Operations of NJDEP and a primary author of the Plan, stated that Bergen County already appears to be losing C & D material because haulers are bypassing the system. Similarly, Frank Giordano, Executive Director of the Pollution Control Financial Authority of Camden County, stated in his deposition that Camden County saw a decrease in the waste coming into its facilities in the summer of 1995. *Certification of William E. Goydan, Deposition of Frank Giordano*, at 20–21.

If a decrease in C & D waste disposal has indeed occurred, it is probably due to illegal waste hauling. Such a violation of the law does not demonstrate public harm sufficient to counter the granting of an injunction, but it does buttress the State's argument that a crucial element of its Plan is the mandatory inspection and monitoring of all C & D loads destined for out-of-state disposal.

### 4. Impact on Existing Recycling Programs

One goal of New Jersey's waste flow control is to increase the level of recycling to 60% of the entire solid waste stream by December 31, 1995. *Plan*, at 30. The percentage of C & D waste recycled is high. In 1993, 75% of all C & D waste generated in New Jersey was recycled. *Plan*, at 15. Many counties have come close to achieving the overall recycling goal, and there is great fear that an injunction will impede this progress because companies may ship C & D waste out-of-state rather than recycle it instate. *Sondermeyer Deposition*, at 178. In addition, without a guaranteed flow of materials to recycle, New Jersey's primarily private recycling industry may be adversely affected in terms of job creation and value added to the economy. *Id.* at 72–73, 178.

The current success of New Jersey's recycling efforts regarding C & D waste is a function of the artificially high price of disposal in the State. When it is cheaper for a hauler to recycle materials than to dump them in a landfill, the materials will be recycled. In the 1993 hearings in this matter, representatives of Atlantic Coast admitted that its profits do not come from recycling portions of mixed C & D loads, but from the ultimate disposal of the remaining 80–90% of material, which is solid waste. *See Atlantic Coast*, Oral Opinion, September 8, 1993, at 15.

There are other ways for New Jersey to achieve the same recycling result without discriminating against interstate commerce. For example, New Jersey could supplement its laws to require recycling or source separation of C & D materials created in-state or to provide other financial incentives to those who do so voluntarily. *See*, Clean Communities and Recycling Act, P.L.1981, § 278 (codified at *N.J.S.A.* 13:1E–92 *et seq.*); New Jersey Statewide Mandatory Source Separation and Recycling Act, P.L.1987, § 102 (codified at *N.J.S.A.* 13:1E–99.11 *et seq.*). It is not necessarily improper for the State to consider that high disposal costs make such regula-

tions unnecessary, provided that these high costs are not the result of an unconstitutional restraint on interstate commerce.

### 5. Impact on Solid Waste Planning

The State stresses that its goal of becoming self-sufficient in waste handling will be jeopardized by removing waste control of the C & D portion of the waste stream. Some landfills will be used up more quickly and not in accordance with long-term planning carried out by the State. *Sondermeyer Deposition,* 77–78. Other facilities may close due to under-utilization, leaving no environmentally sound option for disposal in an area. *Brubaker Deposition,* at 25. While there is certainly the potential for significant public harm if a waste disposal crisis again develops, the likelihood of such harm resulting from this preliminary injunction is not significant. These arguments may, however, become relevant at trial when the State attempts to prove that New Jersey's flow control regulations can withstand the strict scrutiny analysis directed by the Third Circuit. *Atlantic Coast,* 48 F.3d at 717–18.

### B. The Mandated Plan

#### 1. Scope of the Injunction

The plaintiffs are seeking an injunction against New Jersey's prohibition of the disposal of C & D waste out-of-state. However, the Court interprets the Plan as eliminating flow control of all C & D mixed loads generated in New Jersey. Any other interpretation would, paradoxically, force haulers to go out of the state to seek lower disposal fees, rather than availing themselves of competitive rates available in other New Jersey districts.[8] Allowing intrastate competition as well as interstate competition will likely have the result that more C & D waste will remain in-state, albeit not in its district of origination, and in-state facilities such as those in Burlington County may experience an increase in revenues because their tipping fee for C & D waste is competitive with out-of-

state facilities. *Sondermeyer Deposition,* at 49, 56–57.

#### 2. Elements of the Plan

The plaintiffs contend that inspections as required under the Plan unconstitutionally discriminate against interstate commerce. The Carbone plaintiffs argue that the local inspections could effectively cut off interstate shipments by unreasonably delaying trucks bound for out-of-state sites, while imposing no comparable burden on trucks using local disposal facilities. *Carbone Response to Plan,* at 5–6. Atlantic Coast asserts that these inspections are overbroad and unnecessary, and has submitted the direct testimony and Unsworn Declaration of William Hargrove to illustrate the added time that is likely to result from the State's inspection requirement. The Court notes that the inspection requirement may actually benefit interstate haulers because they will now have a document from a designated facility which confirms that they are permitted to take an entire load out-of-state. Mr. William Hargrove testified that when his trucks attempted to take mixed loads of C & D waste to Pennsylvania for extraction of recyclables pursuant to *N.J.A.C.* 7:25–6.9, he was subject to enforcement action. While he appeared to attribute this to the States' or counties' reluctance to comply with their own regulations, a more benign explanation is the inability of an enforcement official to know what kind of waste is actually in a truck about to cross the Delaware. If Mr. Hargrove's trucks were subjected to the kind of inspection contemplated by the Plan, any driver would have in her possession sufficient documentation to satisfy a curious law enforcement officer.

The Court finds that the State has sufficient need for monitoring and accurate data collection to require inspection of all C & D waste haulers at designated district facilities before waste is delivered out-of-state.[9] The plaintiffs' argument that the inspection requirement will be used to frustrate out-of-state waste disposal or recycling is prema-

---

**8.** The Court expresses no opinion on whether a plan which exempted only out-of-state disposal of C & D waste from flow control would be subject to legal assault.

**9.** The Court does not interpret the Plan to require initial weighing or inspection of haulers disposing of C & D waste in New Jersey.

ture. The Court would certainly take appropriate action if the State or individual districts implemented this injunction in a manner not designed to satisfy reasonable regulatory objectives but rather to frustrate the goal of the Court's orders.

Loads that are dumped in New Jersey without first being transported out-of-state face the ultimate inspection—operators at the disposal site and state enforcement officials can view exactly what is dumped when a truck tips its load. While an inspection scheme that required dumping of all out-of-state loads for analysis would be burdensome,[10] the Court finds that it is not unreasonable for the State to require a non-dumping inspection of all loads. In addition, the State may require the dumping of random loads for the purpose of spot-checks, or the dumping of a particular load if there is a reasonable suspicion about its contents.

Although plaintiffs' witness testified that dumping would be required on all loads if an accurate inspection and weighing occurred, *Barbiere Deposition*, at 49–50, 54, he also stated that roll-offs are easier to inspect than packer trucks, and that nine of ten waste loads arrive at a transfer station in a roll-off, *id.* at 102–03. Furthermore, Richard Scott Brubaker, Chief of the NJDEP Bureau of Compliance and Enforcement, testified that such dumping would occur in only a small percentage of inspections. In addition, Mr. Brubaker stated that there is typically no back-up at transfer stations and that these stations make an effort not to waste time in processing haulers. While the State has not commented on the suggestion of Cape May County Municipal Utilities Authority that 15% of waste delivery vehicles be subjected to random, full-dumping inspections, the Court notes, without holding, that requiring 15% of all vehicles selected at random to dump their loads for inspection seems excessive in the absence of reason to suspect that the load contains illegal materials.

Plaintiffs' suggestion that New Jersey rely on forms completed by out-of-state facilities is insufficient to meet the State's enforcement concerns because NJDEP has no control over those facilities and no right to inspect them. *Brubaker Testimony*, November 6, 1995. NJDEP has attempted to make inspection arrangements with other states and has found that they do not share its interest in avid record-keeping and scrutiny of waste disposal activities. *Id.*

The Plan appears to contemplate the weighing of the fully loaded truck, since weighing just the waste would require the truck to be emptied and weighed a second time, and then reloaded. This would be a costly and time-consuming procedure. If the State is concerned about the accuracy of figures it receives from out-of-state facilities where the truck will be emptied, it may develop regulations in the next sixty days to monitor truck weight through a system other than dumping of all loads. For example, the State may require that each hauler register the tare weight of its vehicles and containers with the State or county so that these records are on file with the designated inspection facilities and can be compared with full-load weighing to determine the amount of C & D waste being hauled out of New Jersey. *See Unsworn Declaration of George Marinakis, P.E.; Plaintiffs' Joint Response to Declaration of Marinakis.*[11]

Similarly, the State may develop regulations requiring that out-of-state haulers provide New Jersey with a receipt from the ultimate tipping destination that lists the truck's empty weight immediately after the load is dumped. The Court does not make any determinations as to what weighing system the State should employ, or that it must employ one, but rather suggests that there

---

**10.** William Hargrove, owner of William Hargrove Demolition Company, Inc., testified on November 6, 1995, about the hazard of unbalanced loads. He stated that it is difficult and time-consuming to properly balance a load and that if all haulers were forced to unload and reload in-state for inspection prior to transporting waste out-of-state, haulers could not afford to take C & D waste out-of-state.

**11.** During oral argument, it was suggested that haulers can modify trucks to change their tare weights. The risk that any such alterations would impair the State's legitimate need for information is minimal.

are means available to enable the State to gather reasonably accurate information on the quantity of C & D waste being transported out of the state.

### 3. Financing the Plan

There is significant disagreement among the co-defendants [12] as to the appropriate way to fund the Plan and to make up revenues lost by the cessation of flow control of C & D waste. What funding mechanisms are permissible or whether the current rate-making structure can be suspended are matters to be decided by state authorities based on state law, and not by a federal district court. Several counties have suggested that haulers taking C & D waste out-of-state be required to pay a fee to cover the costs associated with providing the weighing and inspection services mandated by the Plan. Whether such a fee can be charged, who should charge it, and how it might be computed are matters, in the first instance, of New Jersey law. Whether such fees might constitute a Commerce Clause violation will not be decided by this Court in the abstract.

## IV. BOND

 When a federal court grants injunctive relief to a party, it must require that the party seeking this relief provide security for any damages that may be incurred by a party found to have been wrongly enjoined, Fed.R.Civ.P. 65(c), unless the action brought by the plaintiff complies with "certain narrowly drawn circumstances," *Temple University v. White*, 941 F.2d 201, 219 (3d Cir.1991). These circumstances include possible loss to the enjoined party and hardship to the injunction applicant, and they will rarely be found. *Id.; Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 103 (3d Cir.1988). The Court does not find that this case fits within the Third Circuit's narrow exception to the security requirement, and will thus require that plaintiffs post appropriate bonds.

 The amount of a bond is within the discretion of the Court. *Frank's GMC*, 847

F.2d at 103. When setting the amount, it is appropriate for a Court to consider both (i) the potential financial harm to defendants, *Alexander v. Primerica Holdings, Inc.*, 811 F.Supp. 1025, 1038–39 (D.N.J.1993) (bond of $7,733,514 required, equal to losses defendant may incur), and (ii) the fact that plaintiffs seek to vindicate a federal right or public interest, *see, e.g., Temple University*, 941 F.2d at 220 and 220 n. 28 (noting that a nominal bond would have sufficed in suit to enforce Medicaid rights); *Lee v. State*, 869 F.Supp. 1491, 1503 (D.Or.1994) (setting nominal bond of $1.00 in case challenging constitutionality of physician-assisted suicide law); *Lysaght v. New Jersey*, 837 F.Supp. 646, 654 (D.N.J.1993) (setting bond of $15,000 when First Amendment challenge raised against a state telemarketing law).

The first factor suggests that the bond be substantial since the defendants have asserted that they will suffer extensive damage under the preliminary injunction. On the other hand, the defendants' revenue losses can largely be recouped through cross-subsidization of disposal fees or the establishment of a fee for inspection and weighing of C & D loads. As plaintiffs have brought this action under the Commerce Clause and are seeking enforcement of a constitutional right, the Court finds it appropriate that plaintiffs each post an injunctive bond in the amount of $50,000.

## V. CONCLUSION

We understand that under the Plan and existing regulations haulers of mixed loads of C & D waste, including multi-district loads, will be permitted to dispose of the non-recyclables either out-of-state or in New Jersey without regard to flow control regulations. Before such mixed loads of C & D waste are taken out-of-state, they must be inspected and weighed in the district which would have governed its disposal under the waste flow control district plans.

The Court finds the Plan to be an acceptable nondiscriminatory means of monitoring

---

12. *See supra*, Part II, Statement of Facts, for a discussion of the funding options proposed by the co-defendants.

the processing and disposal of C & D waste generated in New Jersey which will not cause the public or the defendants irreparable harm. The State will have sixty days to implement the Plan with appropriate regulatory action. If no regulations are in place at that time, haulers of C & D waste will be permitted to (i) take mixed loads of C & D waste to any properly licensed recycling facility, whether in New Jersey or elsewhere, and (ii) dispose of the unrecycled residue at any lawfully operated site, whether in New Jersey or elsewhere.